Douglas L. OGDEN, Appellant,

v.

Julie L. OGDEN, Appellee.

No. S–9815.

Supreme Court of Alaska.

Dec. 14, 2001.

Rehearing Denied Feb. 6, 2002.

Douglas L. Ogden, pro se, Anchorage.

Robin A. Taylor, Law Office of Robin A. Taylor, Anchorage, for Appellee.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

*OPINION*

BRYNER, Justice.

## I. *INTRODUCTION*

Douglas Ogden appeals the custody and property division provisions of a divorce decision and challenges the trial court's refusal to disqualify the child custody investigator for apparent gender bias because her yellow-page listing advertised her as an attorney who was a "voice for women and children." Although we find that the yellow-page listing gives rise to a reasonable appearance of bias that warranted disqualification, we conclude that failure to disqualify the custody investigator amounted to harmless error. But we further conclude that unjustified delay in entry of the written judgment and resulting discrepancies between that judgment and the superior court's earlier oral decision necessitate a remand for reconsideration of the judgment's visitation provisions; we similarly hold that discrepancies and oversights in the judgment's provisions addressing the division of marital property must be clarified on remand.

## II. *FACTS AND PROCEEDINGS*

Julie Ogden and Douglas Ogden were married in 1985 and lived in Anchorage with their two children: Wendy, born in April 1987, and Patrick, born in July 1992. On January 17, 1999, Douglas—secretly intending to end the marriage and keep permanent custody of his daughter—abruptly abandoned his job, his family home, and his wife and son, and absconded to Juneau with Wendy. After spending a week with a friend in Juneau who ultimately asked him to leave, Douglas traveled to Tok with Wendy, moved in with his sister and brother-in-law, and enrolled Wendy in school. During this time Douglas maintained sporadic contact with Julie but refused to disclose his and Wendy's location.

On January 21, 1999, four days after Douglas absconded, Julie filed for divorce in Anchorage. Less than two weeks later, Julie managed to locate Douglas and Wendy in Tok and, after a hastily scheduled hearing held in Anchorage on February 5, 1999, she secured an order that gave her interim custody of both Wendy and Patrick. The interim

order appointed Anchorage attorney Jacqueline Bressers to conduct a child custody investigation and prepare a recommendation for permanent custody. Although the interim order also established a visitation schedule that allowed Douglas to maintain supervised contact with his children, Douglas balked at the order's supervision requirement and elected not to exercise his visitation rights.

Ten months later, in December 1999, Douglas and Julie signed agreements formally retaining Bressers to conduct the custody investigation. By March 2000 more than a year had passed without visitation between Douglas and his children; Bressers, who was actively conducting her custody investigation, met with Douglas—evidently at his request—to arrange a visitation schedule that would enable her to observe him interacting with the children. The conference resulted in a stipulation allowing Douglas to have supervised visitation for approximately six hours on alternating Saturdays.

The Ogdens' divorce trial was scheduled to begin in June 2000. In May Douglas moved to delay the trial and asked for an expedited hearing to determine Bressers's ability to serve as custody investigator. His motion alleged that Bressers was biased against men and claimed that she had displayed that bias in a child custody recommendation that she had prepared on April 6, 2000. To bolster his allegation of gender bias, Douglas submitted, among other things, a copy of Bressers's listing in the attorney's section of the Anchorage yellow pages, where Bressers advertised herself as a "Voice for Women and Children."

At the time that Douglas filed his motion, Bressers had completed her custody investigation and was preparing her final report. The superior court, noting that Bressers had been appointed since February 5, 1999, and that Douglas had failed to specify when his dissatisfaction with Bressers initially arose, concluded that Douglas had not established grounds for an expedited hearing. The court declined to delay the trial or to hear Douglas's motion immediately, indicating that it would be addressed as a preliminary issue at the outset of trial. Douglas subsequently renewed his motion, submitting supplemental descriptions of actions on Bressers's part that, in his view, established her bias. The court evidently took no action on the renewed motion before the time of trial.

On June 14, the day set for trial, the superior court conducted an extensive hearing into Douglas's claim that Bressers was biased. Upon concluding the hearing, the court found that Douglas had failed to establish grounds for Bressers's disqualification; the court observed that Douglas's disagreement with Bressers's report was not an indication of bias but was instead "something that occurs in every case." After noting that Bressers's yellow-page advertisement dealt with her field of practice as an attorney and that it is common for attorneys to advertise their specialties, the court explained that attorneys who are appointed as child custody investigators "wear different hats" by serving as neutral advisors to the court. In short, while recognizing that, as a lay person, Douglas might easily jump to the conclusion that "there is an agenda here," the court found no evidence of actual bias warranting Bressers's disqualification.

Because the hearing into bias had been so time consuming, the court postponed the trial until July. The rescheduled trial began on July 11, 2000. While the trial nominally dealt with issues of both property and custody, the parties primarily disputed custody. In oral findings made on the record at the close of trial, the court divided the marital property equally and granted Julie sole legal and physical custody of both children. The court also established a "stair-step" visitation schedule designed to work progressively toward allowing Douglas to assume shared custody of both children.

As described by the court, the stair-step approach initially required Douglas to follow the supervised visitation schedule in existence at the time of trial, which the parties agreed gave Douglas about seven hours of supervised visitation every two weeks. After three months, supervised visitation would increase by one hour. And the court proclaimed that it would consider further increases—possibly including unsupervised and

overnight visits—after Douglas submitted the results of a psychological evaluation.

Upon entering these oral findings on the record on July 12, 2000, the court directed Julie's attorney to submit proposed written findings and conclusions.[1] Douglas promptly tried to appeal the decision, but his notice of appeal was held in abeyance by the Appellate Court Clerk's Office because the superior court had not yet entered a written judgment. On August 30, seven weeks after the court ordered Julie's attorney to submit written findings and conclusions, Douglas filed a motion asking the court to compel Julie's attorney to comply with the order. In his motion, Douglas complained that the court's delay in issuing its written decision was prejudicing his right to visitation and preventing him from pursuing his right to an appeal.

A month later, on September 29, the court granted Douglas's motion and ordered Julie's attorney to produce the proposed findings within ten days or show cause for her delay. Julie's counsel filed the proposed findings and conclusions on October 2, and the court signed them the following day without making any revisions.

Douglas's appeal then proceeded.

## III. *DISCUSSION*

### A. *The Disqualification of the Child Custody Investigator* [2]

■ Douglas initially contends that the superior court abused its discretion in failing to disqualify Bressers as the child custody investigator. He accuses Bressers of gender bias, supporting his accusation by pointing to Bressers's yellow-page ad and various signs of bias that Douglas detected in the course of Bressers's custody investigation.

The superior court considered this evidence before denying Douglas's motion to disqualify Bressers but concluded that it failed to reveal any actual bias. In the court's view, Bressers's yellow-page ad merely described her chosen specialty as an attorney; it did not reflect on her function as a court-appointed custody investigator, a role that required her to act neutrally. The court also found no evidence of bias in Bressers's conduct during the custody investigation, noting that her report "doesn't miss the mark" with respect to the fundamental issues disputed at trial.

In our view, the record fully supports the superior court's findings. But the findings themselves focus too narrowly on the issue of actual bias without independently considering the issue of appearance of bias. We have not previously discussed appearance of bias or impropriety in connection with a court-appointed child custody investigator's role. But because court-appointed custody investigators are officers of the court and perform quasi-judicial functions, the Code of Judicial Conduct provides a helpful analytical framework.[3] The Code states: "In all activities, a judge shall ... avoid impropriety and the appearance of impropriety."[4] The commentary to the Code defines appearance of impropriety by an objective standard—one that asks not whether a judicial officer displayed actual bias but "whether the conduct would create in reasonable minds a *perception* that the judge's ability to carry out judicial responsibilities with integrity, impartiality and competence is impaired."[5]

■ Applying this standard here, we conclude that reasonable minds could understandably doubt the impartiality of a court-appointed custody investigator who, as an attorney practicing in the field of domestic relations, claimed to be "a voice for" only

1. Specifically, the trial court stated, "Ms. Taylor, I'm going to ask you to draft these findings up. Okay? I made very general findings. You can listen to the tape. See what's in there, okay?"

2. We apply the abuse of discretion standard to review a trial court's decisions relating to appointment of a child custody investigator and admission of the investigator's report into evidence. *See R.M. v. S.G.*, 13 P.3d 747, 749 (Alaska 2000).

3. *See Lythgoe v. Guinn*, 884 P.2d 1085, 1087–88 (Alaska 1994).

4. Alaska Code of Judicial Conduct Canon 2(A).

5. *Id.* at Canon 2(A) commentary (emphasis added).

one gender. The appearance of bias would be greatly compounded in cases involving pro se litigants, who, without the benefit of advice from an experienced advocate, might find it difficult to accept the notion that practicing lawyers are often expected to "change hats" when they act in different capacities. In such cases, even if a custody investigator's report might ultimately demonstrate the absence of actual bias, the litigant's initial suspicions would be likely to jeopardize the reliability of the investigation; for the effectiveness of the process itself largely depends on the confidence and trust of all interested parties. For these reasons, then, we conclude that a court-appointed child custody investigator is ordinarily subject to disqualification upon a showing of either actual or apparent bias.

 In the case at hand, however, even though we find that Bressers's yellow-page advertisement created an appearance of bias sufficient to warrant disqualification, we conclude that any error in failing to grant Douglas's motion for disqualification was clearly harmless. We note initially that, even apart from Bressers's recommendation, the evidence at trial strongly supports the superior court's custody decision.[6] Furthermore, by expressly observing that the evidence proved Bressers's recommendations to be accurate in all significant respects, the court demonstrated that its custody decision was based primarily on the evidence, rather than on Bressers's report. The court thus demonstrated its awareness that Bressers's custody recommendations were not binding and that the court had the duty to independently determine the children's best interests. And our review of the record also convinces us that Douglas failed to present any plausible evidence of bias apart from the inherent appearance of bias arising from Bressers's yellow-page advertisement.

A final factor that we consider is the timing of Douglas's motion to disqualify Bressers. Douglas filed his motion in May 2000, just a month before the case was scheduled for trial. Fifteen months had passed since

the divorce action was filed; more than fourteen months had elapsed since the court originally appointed Bressers; and five months had elapsed since Douglas first met Bressers and signed an agreement retaining her to perform the custody investigation. The month before Douglas filed his motion, Bressers had completed her investigation; Douglas had just received her initial recommendations, which favored granting primary custody to Julie.

Although Douglas contended below that he moved to disqualify Bressers as soon as he could, his own affidavit belies that contention, expressly acknowledging that he already knew of Bressers's yellow-page advertisement when he met with her in December 1999 and signed the agreement retaining her to perform the investigation. The timing of the disqualification motion thus strongly suggests that Douglas's motion reflects his displeasure with Bressers's recommendation rather than a genuine concern over the appearance of bias arising from her yellow-page ad.

Considering the totality of these circumstances, we find no reasonable possibility that a report by a different custody investigator would have had any appreciable effect on the superior court's custody decision. Finding nothing to indicate that Douglas suffered actual prejudice, then, we decline to hold that the failure to disqualify Bressers amounted to reversible error.

### B. *The Timeliness and Accuracy of the Written Decision*

Douglas next challenges the merits of the superior court's decision. His challenge focuses on the delayed issuance of the court's written findings of fact and conclusions of law and their failure to accurately reflect the court's previously announced oral decision. Douglas's arguments on these points have considerable merit.

We turn first to the issue of timeliness. After announcing its decision on record at the conclusion of the trial on July 12, the

---

6. We review a trial court's child custody decision for abuse of discretion. *See Borchgrevink v. Bor-*

*chgrevink,* 941 P.2d 132, 134 (Alaska 1997).

superior court directed Julie's attorney to submit proposed findings and conclusions. Alaska Civil Rule 78 expressly required Julie's counsel to file the proposed findings and conclusions within ten days:

> Unless otherwise ordered by the court, counsel for the successful party to an action or proceeding shall prepare in writing and file and serve on each of the other parties proposed findings of fact, conclusions of law, judgments and orders. *In a case in which the custody of children is at issue, a party required to prepare findings of fact, conclusions of law, or a judgment or order pertaining to that issue shall serve and file them within 10 days after the day on which the judge announces on the record that the party is to prepare them,* pursuant to Rule 58.1(a)(1).[7]

Julie's attorney failed to comply with this requirement, did not seek an extension of time, and offered no explanation for her noncompliance. More than seven weeks after the court announced its decision, on August 30, Douglas moved for an order compelling Julie's attorney to produce the proposed findings and conclusions. He complained that the court's delay in entering written findings and conclusions had hampered his efforts to appeal and was prejudicing his visitation rights.

On September 29 the court ordered Julie's attorney to produce the proposed findings and conclusions within ten days or show cause for failing to do so. Julie's counsel submitted the proposed findings on October 3—nearly three months after the court's oral ruling. The court signed the proposed findings and conclusions the next day, without change. As Douglas correctly observed in his August 30 motion to the court, this delay

interfered with his ability to seek timely appellate review.[8] And as we explain in detail below, the delay also led to discrepancies between the court's oral and written rulings that effectively left its stair-step visitation plan in limbo.

Normally, when inconsistencies arise between a court's oral and written findings, the written decision prevails.[9] But the normal rule assumes that—and consequently only applies when—the trial court consciously made or endorsed the changes incorporated in its written decision. We have held that a trial court abuses its discretion when it adopts, without explanation or change, proposed findings of fact and conclusions of law that substantially deviate from the court's earlier oral decision.[10]

We have also emphasized that the role of counsel in drafting proposed findings and conclusions is that of "a scribe who must accurately memorialize the court's oral findings and conclusions."[11] And we have placed a particularly heavy burden of accuracy on attorneys whose opponents are unrepresented by counsel: "[I]f the opposing party has no lawyer and is less able or less likely to mount an effective challenge to the proposed written findings, counsel must take extra care to ensure faithful and accurate renditions of the court's ruling."[12]

The findings and conclusions proposed by Julie's counsel fell short of this mark in several respects. Most prominently, the superior court's oral order establishing a stair-step visitation program expressly specified that Douglas's visitation was to increase to eight hours each weekend "after three months *starting now.*" Yet almost three months later, Julie's counsel submitted proposed findings that failed to include this ref-

---

7. Alaska R. Civ. P. 78 (emphasis added).

8. Under Appellate Rule 202(a), Douglas had the right to appeal upon entry of a final judgment; under Appellate Rule 218(d) this right accrued on "the date shown in the clerk's certificate of distribution on the order or judgment." Accordingly the appeal was not ripe until the superior court entered and distributed its judgment. Douglas initially submitted a notice of appeal on August 15, 2000, but his opening pleadings were held until the superior court entered its written judgment.

9. *Lowe v. Lowe,* 944 P.2d 29, 33–34 (Alaska 1997).

10. *McDougall v. Lumpkin,* 11 P.3d 990, 998 (Alaska 2000).

11. *Id.*

12. *Id.*

erence to timing; on their face, the written findings seemingly made the stair-step plan's initial three-month extension effective as of the date the written plan was signed, rather than at the time of trial. By failing to include the oral decision's specific timing provision, then, the written findings effectively doubled the visitation plan's first step.[13]

The written decision is also inaccurate in other respects. For example, it requires Douglas to undergo a psychological evaluation "conducted by Dr. Melinda Glass or the alternate therapist selected by the parties." This language implicitly makes Dr. Glass the default examining physician: absent Julie's consent to another physician, the provision seemingly requires Douglas to submit to an evaluation by Dr. Glass. But as Douglas correctly points out, the superior court's oral findings did not specify Dr. Glass as the default therapist. In its oral judgment, the court ordered Douglas to undergo a psychological evaluation by a therapist whom the parties mutually agreed upon. The court did say that Dr. Glass seemed like a logical choice for Douglas. But it also suggested other possible candidates and did not require or suggest that Douglas be evaluated by Dr. Glass if the parties were unable to agree on another therapist.

The inaccuracies in the written findings and conclusions are not confined to custody provisions. For example, the court's oral decision specified that the marital portions of Douglas's retirement plans were to be divided equally by a qualified domestic relations order (QDRO) and that the court would retain jurisdiction over Douglas's unvested National Guard plan until it vested. But while the written decision includes a provision dividing Douglas's retirement benefits equally, it neglects to mention the use of a QDRO. The written decision thus fails to specify a method for dividing these assets.[14]

Besides these omissions of parts of the oral decision, the written findings and conclusions add provisions not found in the oral findings. The court's oral decision did not specify the time frame for determining the marital portion of the retirement benefits. Without seeking clarification or guidance on this point, Julie's counsel simply included a provision specifying that "retirement benefits earned between February 23, 1985 and July 12, 2000" were to be deemed marital for purposes of the property division. Yet these dates appear to be unduly favorable to Julie. Marital property available for distribution in a divorce is ordinarily identified as of the date of separation rather than trial.[15] Yet here, the written decision uses the date of the parties' trial—July 12, 2000—not the date of their separation—January 17, 1999— to establish the period during which Douglas's retirement funds should be deemed marital.

In summary, by submitting written findings that did not conform to the exact terms of the superior court's oral findings, Julie's counsel overstepped her role as the court's scribe. New or additional matter should not have been included in the written findings without giving Douglas advance notice of the changes and an opportunity to object.[16] And if Julie's counsel encountered questions or uncertainties in drafting the findings and conclusions, she should have at least specified in her proposed order those findings that were extrapolations from the court's oral remarks or otherwise were not mentioned by the court. Here, because the superior court had no notice of the discrepancies between the written and oral decisions, because the written version was submitted so long after the court announced its oral decision, and because the court signed the proposed version without revision or correction almost immediately after its submission,[17] we con-

---

13. The prejudicial delay in Julie's production of proposed findings is discussed more fully *infra*.

14. As of the date that the appellate record was certified to this court, the superior court's file contained nothing to indicate that a QDRO had been issued.

15. *E.g., Hanlon v. Hanlon,* 871 P.2d 229, 231 (Alaska 1994).

16. *See McDougall,* 11 P.3d at 998.

17. Douglas's failure to file an objection in the superior court to Julie's proposed findings and conclusions does not preclude him from disputing these inaccuracies on appeal. Because the court signed Julie's proposed findings and conclusions the day after they were filed with the court and served upon Douglas, Douglas had no opportunity to object.

clude that the written decision must be vacated and that this case must be remanded for entry of an amended judgment.[18]

## C. *Remaining Property Issues*

 Douglas also challenges several aspects of the superior court's order dividing the marital property. Alaska Statute 25.24.160(a)(4) gives trial courts broad discretion to divide the marital property of divorcing litigants.[19] Dividing a marital estate involves a three-step process: identifying, valuing, and dividing the marital assets.[20] Legal determinations made within the first step are reviewed under the independent judgment standard.[21] The second step usually involves factual determinations, reversed only if made in clear error.[22] Allocations under the third step are reviewed under the abuse of discretion standard and will not be disturbed unless clearly unjust.[23]

In its oral findings at the close of trial, the superior court divided the marital property equally, evidently adopting the property schedule presented in Julie's trial brief. While Douglas's arguments challenging the property division are cursory and difficult to follow, they focus partly on the superior court's decision to divide his retirement plans by QDRO. As already noted above, the superior court's oral decision required the retirement plans to be divided by QDRO but did not specify the dates to be used in distinguishing marital from non-marital earnings; in contrast, the written decision omitted any reference to QDROs and incorporated potentially incorrect marital dates that Julie's counsel supplied without notice to the court or to Douglas. On remand, the court should address these deficiencies.[24]

---

18. The current record does not allow us to determine how greatly Douglas's visitation was actually impaired by the written judgment's delayed issuance and its omission of any reference to the effective date of the stair-step visitation provision; accordingly, on remand the superior court will need to fashion a new custody order based on the current best interests of the children. Because our decision vacates the superior court's written order and requires a reevaluation of best interests on remand, we need not consider other arguments raised by Douglas concerning the custody order.

19. AS 25.24.160 provides in pertinent part:
(a) In a judgment in an action for divorce or action declaring a marriage void or at any time after judgment, the court may provide
. . . .
(4) for the division between the parties of their property, including retirement benefits, whether joint or separate, acquired only during marriage, in a just manner and without regard to which of the parties is in fault; however, the court, in making the division, may invade the property, including retirement benefits, of either spouse acquired before marriage when the balancing of the equities between the parties requires it; and to accomplish this end the judgment may require that one or both of the parties assign, deliver, or convey any of their real or personal property, including retirement benefits, to the other party; the division of property must fairly allocate the economic effect of divorce by being based on consideration of the following factors:
(A) the length of the marriage and station in life of the parties during the marriage;
(B) the age and health of the parties;
(C) the earning capacity of the parties, including their educational backgrounds, training,

employment skills, work experiences, length of absence from the job market, and custodial responsibilities for children during the marriage;
(D) the financial condition of the parties, including the availability and cost of health insurance;
(E) the conduct of the parties, including whether there has been unreasonable depletion of marital assets;
(F) the desirability of awarding the family home, or the right to live in it for a reasonable period of time, to the party who has primary physical custody of children;
(G) the circumstances and necessities of each party;
(H) the time and manner of acquisition of the property in question; and
(I) the income-producing capacity of the property and the value of the property at the time of division.

20. *Dodson v. Dodson,* 955 P.2d 902, 905 (Alaska 1998); *Wanberg v. Wanberg,* 664 P.2d 568, 570 (Alaska 1983).

21. *Id.*

22. *Id.*

23. *Id.*

24. We note also that the superior court's findings on the retirement assets failed to address evidence indicating that, in addition to his Loomis Fargo and National Guard retirement plans, Douglas evidently maintained a separate Loomis Fargo 401(k) account of undetermined value. In contrast to the retirement plans, the 401(k) ac-

Douglas additionally complains that the superior court failed to account for the financial effects that his post-separation bankruptcy had on the parties' marital debts. Julie acknowledged in her trial brief that Douglas's bankruptcy action discharged his obligation on various marital debts; but the brief also indicated that Julie remained liable for many of the discharged debts, including a USAA Savings Bank obligation of $7,300 and People's Bank VISA debt of $7,200. Yet at the same time, Julie acknowledged that she was awaiting a refund for post-discharge payments that she had made on a different marital credit card debt that had been discharged in the bankruptcy-a $4,300 debt to Providian Bank VISA. Without commenting on Douglas's bankruptcy discharge, the superior court simply accepted Julie's characterization of all of these credit card debts as still current marital obligations. The court thus divided the total debt equally, stipulating that Douglas should receive a proportionate credit if Julie ever received a refund for her Providian Bank VISA payments.

Douglas questions this decision. Relying on Julie's apparent acknowledgment that she may be entitled to assert his bankruptcy discharge to recover her post-discharge payments on the Providian Bank VISA obligation, Douglas questions her claim that she remains personally liable for the full amount of the now-discharged USAA Savings Bank and People's Bank obligations. Julie does not specifically respond to this argument. Because the findings below neither addressed the effects of Douglas's bankruptcy discharge nor explained the court's reasons for counting the discharged obligations as marital debt, we are unable to review the court's ruling and conclude that this issue must be remanded for further findings.

Douglas also complains that neither Julie's trial brief nor the superior court's findings properly accounted for several articles of marital property that the court authorized Julie to sell while the parties' divorce action was pending. This argument lacks merit. The property in question was sold in accordance with a May 1999 order granting Julie's motion to sell several marital articles in her possession to allow her to pay current living expenses and accrued marital debts. The record does not disclose how much money Julie realized in the sale or how she spent the sale proceeds. As Douglas correctly observes, the court did not credit Julie with the proceeds of the sale in its order dividing the marital property.[25]

But we have consistently held that a divorce court engaged in dividing property should usually identify marital assets as of the time of separation but establish their value at the time of trial.[26] Ordinarily, then, neither party is charged for loss in the value of marital property occurring in the interim between separation and trial.[27] Al-

count could conceivably contain currently accessible funds with a readily apportionable present value; if so, these funds might be easily divided without recourse to a QDRO. After the superior court orally announced its decision to divide Douglas's retirement funds by QDRO, Douglas attempted to inquire into the court's treatment of this 401(k) account, possibly meaning to suggest that the court consider immediately dividing that account's present value, so that Douglas could use his share of the cash to pay his share of the marital debt. The court—perhaps failing to recognize a potential distinction between Douglas's personal 401(k) account and his employers' retirement plans—simply informed Douglas that the money would be divided by QDRO. Given the possible distinctions between Douglas's 401(k) account and his employer retirement plans, the superior court should reconsider this issue on remand if Douglas is inclined to assert it.

25. It does not appear that Julie used the sale proceeds to pay down existing marital debt. The

marital debts listed in Julie's trial brief are identical to those reflected in Julie's form DR 250 financial statement, which she filed in April 1999, a month before the court issued its order authorizing the sale of marital assets.

26. *Dodson v. Dodson*, 955 P.2d 902, 905 (Alaska 1998) (court's decision dividing property should identify marital property existing at the time of separation, establish value of that property at the time of trial, and allocate the property in an equitable manner); *see also Jones v. Jones*, 942 P.2d 1133, 1136 (Alaska 1997); *Hanlon v. Hanlon*, 871 P.2d 229, 231 (Alaska 1994); *Ogard v. Ogard*, 808 P.2d 815, 819 (Alaska 1991).

27. *See, e.g., Jones*, 942 P.2d at 1139; *Foster v. Foster*, 883 P.2d 397, 399–400 (Alaska 1994); *Ogard*, 808 P.2d at 819–20.

though we have occasionally recognized an exception that allows recapture of property that has been dissipated or wasted in the interim between separation and trial,[28] Douglas alleges no exceptional circumstances that would warrant recapturing the value of the articles sold in this case. We find no error in the trial court's failure to account for the sold articles.

## IV. CONCLUSION

For the reasons discussed above, we AFFIRM in part, REVERSE in part, and REMAND for further proceedings and entry of a new order consistent with this opinion.