Lesley J. WATEGA, Appellant,

v.

Craig T. WATEGA, David Drumm,
and Kristy Drumm, Appellees.

No. S–11652.

Supreme Court of Alaska.

Sept. 8, 2006.

Rehearing Denied Oct. 23, 2006.

David A. Golter, Golter & Logsdon, P.C., Palmer, for Appellant.

Michael Jungreis, Bethany A. Pribila, Hartig Rhodes Hoge & Lekisch, PC, Anchorage, for Appellees Kristy and David Drumm.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

MATTHEWS, Justice.

## I. INTRODUCTION

At issue in this case is whether the superior court erred when it authorized the sale of a divorcing couple's home on motion of one party and over the objection of the other. We conclude that while courts do have the authority to permit the sale of property despite the objection of a party when a divorce is pending, that authority should be exercised sparingly and only for pressing reasons. Here, because no pressing reason existed, the superior court abused its discretion when it permitted the sale.

## II. FACTS AND PROCEEDINGS

Lesley and Craig Watega married in 1994. Four years later, the couple built the house that is the subject of this dispute. The title to and the deed of trust on the house were in both Lesley and Craig's names.

Craig filed for divorce in January 2002. The superior court, in an interim order, gave Craig possession of the house for the duration of the divorce proceedings. The court also required Craig to pay the existing deed of trust note arrearages and to make all future payments on it. Despite the court's order, Craig did not make any payments, and the Wategas fell even further behind in their deed of trust note payment obligations.

Because none of the 2002 deed of trust payments had been made, the holder of the deed of trust began threatening foreclosure. At the end of May 2002, worried about foreclosure and with his divorce still pending, Craig petitioned the court to compel the sale of the property. Craig explained that he had found purchasers, David and Kristy Drumm, who were willing to pay $147,100 for the house, which Craig described as a "break-even price." Craig knew David Drumm from their employment together in the Alaska National Guard.

Lesley opposed the compelled sale. In response, Craig explained to the court that the sale price would actually be closer to $153,000 because the Drumms would pay the approximately $6,000 of payments in arrears. In addition, the Drumms would pay all of the closing costs. Craig also informed the court that the Drumms wanted "until December 2003 to secure financing." Until they obtained financing, the Drumms would "lease" the property at the amount of the monthly payment plus dues.

Craig submitted to the court a copy of an agreement the Drumms had signed. The Drumms had experience in buying and selling real estate, and it was they who provided Craig with the form agreement, which was entitled "Earnest Money Receipt and Agreement to Purchase" (EMA). David Drumm drafted and Kristy Drumm handwrote additional terms and conditions, which read as follows:

> (1) Buyer will pay arrears of current mortgage[;] (2) Buyer will lease property for at least 18 months in order to obtain financing[;] (3) Lease will be at current mortgage rate per month plus annual dues[;] (4) if financing is unattainable buyer will be reimbursed for arrears payment made, including any additional payments made to principal[;] (5) if financing is unattainable buyer will be reimbursed for any improvements made that increase the property value[,] i.e. fences, paving or additional building[;] (6) Buyer will pay all closing cost as stated above in costs.

Without conducting a hearing, the court granted Craig's motion for a proposed sale. The Drumms moved into the home very soon after the court issued its order. Before the Drumms moved in, but possibly after the Drumms had paid the arrearages, Craig

warned David that Lesley would likely continue fighting the sale in court.

Lesley filed a motion for reconsideration, arguing in part that the court should at least have conducted a hearing prior to allowing the property to be sold. The court conducted a hearing in response to Lesley's motion for reconsideration. At the hearing, the court explained that it believed a foreclosure would be bad for Lesley's financial future, given that she had declared bankruptcy in the past. The court refused to change its decision to permit the sale, in part because the sale alleviated the burden of imminent foreclosure, and in part because the Drumms had relied on the court's decision when they moved into the home.

Lesley alleges that sometime after the hearing, Craig changed his mind about selling the property to the Drumms and destroyed the EMA, which he had never signed. Craig also allegedly quitclaimed his interest in the property to Lesley. Craig argues that his execution of the quitclaim deed was the result of duress.

After Lesley asked the court to award her the property based on the quitclaim, the court allowed the Drumms to intervene in the Wategas' divorce proceeding. In their first act as intervenors, the Drumms filed a motion for summary judgment, asking that the court declare them the equitable owners of the property and order specific performance of the EMA. The court granted the Drumms' motion for summary judgment. Instead of declaring the Drumms the equitable owners of the property, however, the court deemed them to be bona fide purchasers for value.

After the Drumms received a preliminary credit approval for a loan on January 5, 2004 (which was five days after the EMA stated that the sale needed to be recorded), they asked Lesley to provide a deed to the house so that they could close. When Lesley's

attorney responded by demanding that the Drumms vacate the property because they had defaulted on the agreement, the Drumms filed a motion for final judgment asking the court to direct Lesley to execute a deed conveying the property to them. Lesley responded with a motion for possession of real property. After a hearing, the superior court issued a final judgment pursuant to Civil Rule 54(b). In the judgment, the court declared the Drumms to have a "valid and enforceable possessory interest" in the property and outlined the process they needed to follow in order to close on the house.

Lesley appeals.

## III. DISCUSSION

### A. The Superior Court Abused Its Discretion when It Permitted Craig To Sell the Home.

#### 1. Courts do have the authority to permit the sale of property while a divorce is pending.

Lesley argues that the superior court had no authority to order the sale of the couple's property before the divorce trial took place. The Drumms respond by saying that AS 25.24.140(b)(6) permitted the court to allow Craig to sell marital property over Lesley's objections.

Alaska Statute 25.24.140 governs orders issued by superior courts during divorce and annulment actions. The statute mentions the sale of marital property during the pendency of a divorce, stating in relevant part:

> (b) During the pendency of the [divorce] action, upon application, a spouse is entitled to necessary protective orders, including orders . . .
>
> (6) prohibiting a spouse from disposing of the property of either spouse or marital property without the permission of the other spouse or a court order.[1]

1. The portions of AS 25.24.140 related to party expenses and superior court orders read as follows:

> (a) During the pendency of the action, a spouse may, upon application and in appropriate circumstances, be awarded expenses, including

(1) attorney fees and costs that reasonably approximate the actual fees and costs required to prosecute or defend the action; in applying this paragraph, the court shall take appropriate steps to ensure that the award of attorney fees does not contribute to an unnecessary escalation in the litigation;

We apply our independent judgment to questions of statutory interpretation.[2]

As Lesley points out, AS 25.24.140(b)(6) is couched in terms of protective orders that preserve assets for later division. However, the statute does envision two exceptions to the prohibition on sale. If one spouse has obtained a protective order to preserve property, the other spouse may still sell the property in two circumstances: if the first spouse grants permission or if the court issues a subsequent order permitting the sale. Because the language about court-ordered sales appears in the exception, AS 25.24.140(b)(6) may not amount to explicit statutory authorization for courts to issue orders for the sale of property. Nevertheless, the language of the statute clearly presumes court authority to permit sales.

We have not previously addressed the issue of whether superior courts have the power to authorize sales of property pending a divorce, but we have responded to an argument that a superior court failed to properly account for the proceeds of such a sale. In *Ogden v. Ogden* the superior court permitted the wife to sell marital assets in order to pay living expenses and marital debts.[3] Later, when the superior court divided the couple's property, it did not credit the wife with the proceeds from the sale.[4] While we did not directly address the superior court's authori-

ty to permit the sale, we expressed no hesitations about the validity of the underlying sale when we upheld the superior court's treatment of the proceeds.[5]

Lesley cites a California appellate case, *Lee v. Superior Court*,[6] to support her argument that the superior court in this case did not have the authority to permit the sale. California, like Alaska, possesses a statute that permits superior courts to issue orders to prohibit the sale of property during the pendency of a divorce.[7] In *Lee*, the appellate court concluded that the statute

> is intended to apply only to prevent a transfer—to maintain the status quo—and does not authorize the trial court, ex parte or otherwise, to change the status quo by authorizing the sale of property involved in a dissolution proceeding and the transfer of the proceeds to one of the parties without adequate safeguards for the other.[8]

However, as Lesley acknowledges, the California statute being interpreted in *Lee*, unlike AS 25.24.140, only allows courts to issue restraining orders; it did not contain a court-ordered sale exception.[9] As a result, the California appellate court's interpretation of the statute in *Lee* is inapposite to whether Alaska courts have the authority to permit sales.

(2) reasonable spousal maintenance, including medical expenses; and

(3) reasonable support for minor children in the care of the spouse and reasonable support for unmarried 18–year–old children of the marriage who are actively pursuing a high school diploma or an equivalent level of technical or vocational training and living as dependents with the spouse or designee of the spouse, if there is a legal obligation of the other spouse to provide support.

(b) During the pendency of the action, upon application, a spouse is entitled to necessary protective orders, including orders

(1) providing for the freedom of each spouse from the control of the other spouse;

(2) for protection under AS 18.66.100—18.66.180;

(3) directing one spouse to vacate the marital residence or the home of the other spouse;

(4) restraining a spouse from communicating directly or indirectly with the other spouse;

(5) restraining a spouse from entering a propelled vehicle in the possession of or occupied by the other spouse; and

(6) prohibiting a spouse from disposing of the property of either spouse or marital property without the permission of the other spouse or a court order.

2. *State v. Dupier*, 118 P.3d 1039, 1044 (Alaska 2005).

3. 39 P.3d 513, 521 (Alaska 2001).

4. *Id.*

5. *Id.* at 521–22.

6. 63 Cal.App.3d 705, 134 Cal.Rptr. 43 (1976).

7. Cal. Civ.Code § 4359, *quoted in Lee*, 63 Cal. App.3d at 709–10, 134 Cal.Rptr. 43.

8. *Lee*, 63 Cal.App.3d at 710, 134 Cal.Rptr. 43.

9. Cal. Civ.Code § 4359, *quoted in Lee*, 63 Cal. App.3d at 709–10, 134 Cal.Rptr. 43.

*Randazzo v. Randazzo*,[10] a case in which the Supreme Court of New Jersey recently addressed the issue of whether courts have the equitable power to order the disposition of property prior to the divorce of the parties, is much more helpful. The spouse opposed the sale of property in *Randazzo* and, like Lesley here, argued that the court only had the authority to distribute marital assets at the time of the divorce, not before.[11] The supreme court concluded otherwise, holding that the courts have the equitable power to order sales pending divorce.[12]

The *Randazzo* court reached this conclusion after analyzing New Jersey's statutes and court rules. Unlike in Alaska, where orders during the pendency of a divorce action are governed by one statute, AS 25.24.140, and the equitable division of property in a divorce judgment is governed by another, AS 25.24.160, in New Jersey, both aspects of the divorce process are controlled by just one statute. The relevant New Jersey statute states that

> [p]ending any matrimonial action ... the court may make such order as to the alimony or maintenance of the parties, and also as to the care, custody, education and maintenance of the children, ... as the circumstances of the parties and the nature of the case shall render fit, reasonable, and just.... [13]

The statute then goes on to authorize courts "where a judgment of divorce ... is entered [to] make such award or awards to the parties ... to effectuate an equitable distribution of the [marital] property, both real and personal...." [14] The statute nowhere specifically mentions court-ordered sales of property. However, a New Jersey court rule does provide that courts can "direct the parties to sell, mortgage, or otherwise encumber or pledge marital assets to the extent the court deems necessary to permit both parties to fund the litigation." [15]

The *Randazzo* court first determined that the portion of N.J. Stat. Ann. § 2A:34–23 allowing courts to make orders necessary for maintenance limits the portion of the statute instructing that equitable distribution occur at the time of the divorce judgment.[16] The court then concluded that it was consistent with the statute and the rule for trial courts to "exercise [their] discretion to order the sale of marital assets." [17]

Since AS 25.24.140(b)(6) explicitly contemplates court authority to order sales of property while divorce proceedings are ongoing, we believe that the existence of such authority is even clearer here than it is in New Jersey.

Because there is no specific language about court orders in the New Jersey statute, the *Randazzo* court locates New Jersey courts' authority to issue such orders in their authority to provide for the parties' maintenance. The New Jersey court resultantly analyzed the issue of whether the trial court had abused its discretion by asking whether the sale of the property in the *Randazzo* case was necessary for the financial maintenance of the parties.[18] Lesley argues that this court should take a similar approach. According to Lesley, if AS 25.24.140 provides superior courts with any authority to permit sales, it only does so if such a sale is necessary to enforce a support order. In other words, Lesley argues that we should interpret AS 25.24.140(b), which addresses court orders, through the lens of AS 25.24.140(a), which permits courts to award spouses expenses, including reasonable spousal maintenance. Alaska Statute 25.24.140 provides no indication that the legislature intended for the separate sections of the statute to be

---

**10.** 875 A.2d 916 (N.J.2005).

**11.** *Id.* at 921.

**12.** *Id.* at 917.

**13.** N.J. Stat. Ann. § 2A:34–23, *quoted in Randazzo,* 875 A.2d at 921 (alteration in case).

**14.** N.J. Stat. Ann. § 2A:34–23(h), *quoted in Randazzo,* 875 A.2d at 921 (alteration in case).

**15.** N.J. Chancery Div. Family Part Rule § 5:3–5(c), *quoted in Randazzo,* 875 A.2d at 923.

**16.** *Randazzo,* 875 A.2d at 924.

**17.** *Id.*

**18.** *Id.*

read together in the way suggested by Lesley. Since AS 25.24.140(b) independently mentions court authority to order sales, we do not need to follow the New Jersey approach and extrapolate such authority from AS 25.24.140(a). That is not to say that superior courts have unlimited authority to permit the sale of property during a divorce, however. We address limitations on such sales in the next section.

### 2. Courts may only exercise their authority to order sales in exceptional circumstances not present in this case.

In addition to questioning the superior court's authority to order the sale, Lesley argues that the superior court abused its discretion when it granted Craig permission to sell the property.

■ We review a superior court's issuance of an order permitting the sale of property using the same abuse of discretion standard that we employ when reviewing other superior court orders.[19] We find an abuse of discretion "when we are left with a definite and firm conviction, after reviewing the whole record, that the trial court erred in its ruling."[20]

The New Jersey Supreme Court, in *Randazzo*, did limit the circumstances in which courts may permit sales of marital property pending divorce. As previously described, the court located the authority to permit sales in a statute permitting maintenance prior to a divorce.[21] The court imported language from that statute into its guidance for trial courts, explaining that courts "may exercise [their] discretion to order the sale of marital assets and the utilization of the proceeds," but only "in a manner as 'the case shall render fit, reasonable, and just.'"[22] Having made that comment, the court explained it would "leave to the discretion of the trial court the varying circumstances that may justify the sale of the marital assets and the utilization of the proceeds prior to the divorce judgment."[23] When assessing whether the trial court had abused its discretion given the specific facts of the *Randazzo* case, the supreme court concluded that it had not, since the sale of one piece of marital property was necessary to generate money needed to meet financial obligations on the couple's other properties.[24]

■ While AS 26.24.140(b)(6) does not provide any limitation on a court's ability to permit a sale of marital property, we agree with the *Randazzo* court that courts do not have unlimited discretion to permit the sale of marital property prior to the division of the property in a divorce judgment. Instead, courts should permit sales sparingly and only for pressing reasons, such as for the prevention of waste of marital assets that justified the sale in the *Randazzo* case.

The superior court, when it decided to permit Craig to sell the house, suggested that a similar pressing reason existed in this case. When Craig filed his motion for a compelled sale in late May 2002, he indicated his understanding that the mortgage company was going to begin foreclosure proceedings at the end of the month. When the superior court later held a hearing on Lesley's motion to reconsider the sale, it indicated that the imminent foreclosure had partly motivated its decision to grant Craig's motion. According to the court,

> When I made the order that said that [Craig] could go ahead and sell [the house], it really seemed like the best thing overall considering all the options. Including that often by the time we get to the divorce trial, everyone's wishing that we had sold

---

19. *See, e.g., Fuller v. City of Homer*, 113 P.3d 659, 662 (Alaska 2005) (reviewing discovery orders for abuse of discretion); *Caldwell v. State*, 105 P.3d 570, 573 (Alaska 2005) (determining whether the superior court abused its discretion when issuing a child support order); *Beal v. Beal*, 88 P.3d 104, 111 (Alaska 2004) (applying an abuse of discretion analysis to "orders that merely enforce a property division or divorce decree").

20. *Peter Pan Seafoods, Inc. v. Stepanoff*, 650 P.2d 375, 378–79 (Alaska 1982).

21. *Randazzo*, 875 A.2d at 924.

22. *Id.*, (quoting N.J. Stat. Ann. § 2A:34–23(h)).

23. *Id.*

24. *Id.*

it during the interim because it's gotten so much worse and especially if there is an actual foreclosure, and you've already had a bankruptcy in '95. That's much worse for your future really than losing a couple thousand here or there.

■ Yet unlike in *Randazzo*, sale of the property in this case did not preserve the assets of the marital estate. For one thing, since the sale of the house was for the amount of the loan, it failed to result in any gain to the estate. Moreover, at the time that the court granted Craig's motion, the foreclosure proceedings apparently had yet to begin. While the mortgage company had notified the Wategas that they were in default, it seems not to have recorded a notice of default.[25] Once the mortgage company recorded the notice of default, it would have to have waited at least three months before selling the property.[26] At any point prior to the sale, the Wategas would have been able to stop the foreclosure process by bringing their payments current.[27] Furthermore, because the mortgage company appeared to be threatening a non-judicial foreclosure, no deficiency judgment could be entered against the Wategas if the mortgage company received less than the amount of the outstanding debt from its sale of the property.[28] As for the superior court's explanation that it was attempting to protect Lesley's credit by averting foreclosure, Lesley, since she objected to the proposed sale, was clearly willing to take the risk that her credit would be harmed.

Since the sale of the property did nothing to increase or preserve the assets of the marital estate, and since protection of Les-

ley's credit is not a sufficiently strong reason to justify a court-authorized sale over Lesley's objection, we conclude that the superior court abused its discretion when it granted Craig's motion.[29]

## B. The Sale of the Property to the Drumms Should Be Rescinded.

### 1. The Drumms do not qualify as bona fide purchasers for value.

When the superior court granted the Drumms' motion for summary judgment and ordered specific performance of the EMA, the court declared the Drumms to be bona fide purchasers for value (BFPs). Later, when considering Lesley's motion for possession of real property, the court reiterated its description of the Drumms as BFPs. The court never explained exactly why it believed the Drumms to be BFPs.

The Drumms contend that the superior court was correct in declaring them BFPs of the property. They argue that their status as BFPs should cut off any rights that Lesley has to the property, since they relied on "the validity of the court order" when they "proceeded with their obligations to purchase the property," beginning with their immediate payment "of over $7,000 to cover the mortgage default."

Lesley argues in response that the Drumms cannot be BFPs because they knew about her interest in the property before they entered into agreement with Craig.

■ Whether or not the Drumms qualify

**25.** AS 34.20.070(b) (requiring a trustee of a deed of trust to record a notice of default prior to selling trust property).

**26.** *Id.*

**27.** *Id.*

**28.** AS 34.20.100.

**29.** Lesley also argues that the superior court abused its discretion because it failed to impose any conditions to protect her interests when it permitted the sale. Since we conclude that the lack of a sufficient justification for the sale in this case precluded the court from ordering the sale, we do not address the way in which sales pend-

ing divorce would need to be structured in the future in order to be permissible.

Our conclusion that the superior court abused its discretion when ordering this sale also means that we do not need to reach Lesley's alternative arguments on appeal, namely: (1) that the superior court violated her right to procedural due process; (2) that disputed issues of material fact existed, precluding the superior court from granting the Drumms' motion for summary judgment; (3) that the Drumms breached the EMA, thereby excusing Lesley from performing; and (4) that the superior court misinterpreted the EMA.

as BFPs is a question of law [30] to which we apply a de novo standard of review.[31]

As the Drumms point out, BFPs frequently obtain protections as a result of their status. For instance, if a BFP purchases property at a voidable foreclosure sale, the trustor cannot later set aside the sale.[32] If, by contrast, the sale was void rather than voidable, BFP status is unavailable to confer protection.[33] Because we conclude, for reasons explained below, that the Drumms do not qualify as BFPs, we do not have to determine whether the transaction in this case is more akin to a voidable or a void foreclosure sale.

 In order to be a BFP, one claiming the status must have "acquired title without notice, actual or constructive, of another's rights and also must have paid value for the same."[34] Here, the Drumms cannot qualify as BFPs because they possibly had actual notice and certainly had constructive notice of Lesley's right to the property at the time that they paid money towards fulfilling their EMA commitment.

Whether the Drumms had sufficient actual knowledge of Lesley's rights to the property is somewhat unclear from the record. Both Craig Watega and David Drumm acknowledge that Craig warned David that Lesley would continue to assert her rights in the property. However, while this warning gave the Drumms notice of Lesley's rights, they may not have received that notice until after they had already paid the mortgage arrearage. David Drumm states that Craig told him about Lesley's threats of litigation, but not until later on the day that he paid the mortgage arrearage. Craig explains that he warned David prior to the Drumms moving into the house, but says nothing about when the warning occurred in relation to the Drumms' payment to the mortgage company.

However, even if the Drumms received actual notice of Lesley's rights only after they had paid some money towards satisfying the EMA, they certainly had constructive notice beforehand of Lesley's claim to the property. The Drumms knew before they entered into the agreement that Craig needed to sell the house because he was getting divorced. They also knew that Craig needed to get permission from the court prior to selling the property. As a result, the Drumms are charged with the knowledge of the documents contained in the public file of the Wategas' divorce case.[35] The file, which contained Lesley's opposition to the sale of the property, provided the Drumms with at least constructive knowledge that Lesley opposed the sale and might exercise her right to challenge it on appeal.

To summarize, the superior court was incorrect when it declared the Drumms to be BFPs. As a result, the Drumms cannot assert BFP status in an attempt to cut off Lesley's rights to the property.

### 2. What a rescission remedy entails in this case.

 Lesley argues that if this court concludes that the superior court did not have the authority to permit the sale in this case, she is "entitled to immediate return of her property." We agree that the transaction between Craig and the Drumms must be

---

**30.** *K & L Distribs., Inc. v. Kelly Elec., Inc.*, 908 P.2d 429, 431, 433 (Alaska 1995).

**31.** *Varilek v. City of Houston*, 104 P.3d 849, 851 (Alaska 2004).

**32.** *Rosenberg v. Smidt*, 727 P.2d 778, 784 (Alaska 1986).

**33.** *Id.* at 783.

**34.** *James v. McCombs*, 936 P.2d 520, 525 n. 9 (Alaska 1997) (quoting *State v. 18,018 Square Feet, More or Less*, 621 P.2d 887, 890 n. 5 (Alaska 1980)).

**35.** *Cf. Stratman v. Leisnoi, Inc.*, 969 P.2d 1139, 1142–43 (Alaska 1998) (explaining that "the lis pendens statute ... simply provides 'a convenient method for giving constructive notice to subsequent purchasers and encumbrancers that their interests may be affected by a pending action.' ") (quoting *Leisnoi v. Stratman*, 835 P.2d 1202, 1210 n. 17 (Alaska 1992)); *Kordecki v. Rizzo*, 106 Wis.2d 713, 317 N.W.2d 479, 483–84 (1982) (Refusing a purchaser of property "purchaser in good faith" status because the property record contained a lis pendens. According to the court, the lis pendens in the record should have led the purchaser to the document contained within the court file of the proceedings described by the lis pendens.).

rescinded. "Rescission is an equitable remedy that abrogates, annuls, or unmakes a contract entered into through mistake, fraud, or duress."[36] Here, Craig and the Drumms mistakenly believed that the sale was valid based on the decision of the superior court. Our decision holds that the court's decision was an abuse of discretion. Therefore the sale was not valid and rescission is required.

Before the superior court, upon remand, rescinds the transaction, it will need to determine whether the property should be returned just to Lesley or to both Wategas. Following Craig's transaction with the Drumms, he signed a quitclaim deed purporting to transfer his interest in the property to Lesley. Based on this transaction, it would seem that Craig no longer has any interest in the property and that it should resultantly be returned to Lesley. However, Craig later argued that he signed the quitclaim deed as the result of duress. The issue of the validity of the quitclaim may need to be resolved before the superior court can know to whom to return the property. Whoever receives the property will be responsible for reimbursing the Drumms as outlined below.

When the superior court rescinds the transaction, it should keep in mind that rescission involves restoring the parties to their "pre-contract position[s], at least as far as [it is] possible to do so."[37] As the Iowa Supreme Court has explained, rescission "calls for a return of the land to the seller, with the buyer given judgment for payments made under the contract plus the value of improvements, less reasonable rental value for the period during which the buyer was in possession."[38] In this case, restoring the parties to their pre-contract positions will entail returning the property to either Lesley or both Wategas. In exchange, the recipient of the property will need to return the payments made by the Drumms, as adjusted for the Drumms' use of the property, plus the reasonable value of any improvements.

To adjust for the Drumms' use of the property, the EMA is a reasonable starting point. It contains a formula for reimbursing the Drumms in the event that the sale could not be finalized. The relevant terms of the EMA provide that:

> (3) Lease will be at current mortgage rate per month plus annual dues[;] (4) if financing is unattainable buyer will be reimbursed for arrears payment made, including any additional payments made to principal[;] (5) if financing is unattainable buyer will be reimbursed for any improvements made that increase the property value[,] i.e. fences, paving or additional building. . . .

Under the EMA, since the lease payments equaled the mortgage payments plus the annual dues, the recipient of the property would need to return to the Drumms the arrears payment plus the reasonable cost of improvements they made that increased the value of the property.

Lesley, of course, was not a party to the EMA and she is not therefore bound by its terms, including the rescission formula that it contains. But the EMA at least sets out terms that Craig Watega and the Drumms found to be acceptable. Further, the rescission terms appear to be facially reasonable. On remand Lesley is entitled to argue that a different formula should be employed, but absent a persuasive showing to the contrary, the court may choose to follow the EMA.

## IV. CONCLUSION

For the above reasons we REVERSE the grant of Craig's motion for compelled sale of the couple's marital home. We REMAND the case so that the superior court can enter an order rescinding the sale of the property, conditioned on the reimbursement of the Drumms. The superior court must give the recipient of the property reasonable time, to be not less than ninety days after the issuance of the order setting the reimbursement

---

**36.** *McKeown v. Kinney Shoe Corp.,* 820 P.2d 1068, 1071 (Alaska 1991).

**37.** 1 Dan B. Dobbs, Law of Remedies § 4.8, at 676 (2d ed.1993).

**38.** *Potter v. Oster,* 426 N.W.2d 148, 151 (Iowa 1988).

amount, within which to reimburse the Drumms.