*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| JERRY B., | ) | |
| | ) | Supreme Court No. S-15684 |
| Appellant, | ) | |
| | ) | Superior Court No. 1JU-11-00638 CI |
| v. | ) | |
| | ) | O P I N I O N |
| SALLY B., | ) | |
| | ) | No. 7107 – June 10, 2016 |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, First Judicial District, Juneau, Philip M. Pallenberg, Judge.

Appearances: Jerry B., pro se, Haverhill, Massachusetts, Appellant. No appearance by Appellee Sally B.

Before: Stowers, Chief Justice, Fabe, Winfree, Maassen, and Bolger, Justices.

BOLGER, Justice.

## I.    INTRODUCTION

A husband and wife separated after the husband was charged with sexually abusing their minor daughter. The husband eventually pleaded guilty to the crime of indecent exposure in the first degree. In the civil divorce suit, the superior court took judicial notice of the conviction, concluded that the husband's sexual offense was the cause of his current financial woes and was therefore a form of economic misconduct, and divided the marital property 70-30 in the wife's favor. The court also concluded that

the wife had not wasted or otherwise misused marital funds she had withdrawn between separation and trial and accordingly declined to recapture those funds in the property division.

The husband appeals, claiming the superior court should not have considered his criminal offense and by doing so demonstrated bias against him. The husband also contends that the superior court abused its discretion by favoring the wife in the property division and that his due process rights were violated.

We conclude that the impartiality of the superior court cannot be reasonably questioned, that the court properly considered the husband's conviction and its consequences in the property division, and that the husband's due process rights were not violated. But the superior court erred by treating the wife's attorney's fees as marital expenses, by failing to address the husband's request for fees, and by adjusting the property division to account for expenses the husband was separately obligated to pay. Accordingly, we remand this case for further proceedings consistent with this decision.

## II. FACTS AND PROCEEDINGS

Jerry B. and Sally B.[1] married in August 1999, and moved to Juneau in the early 2000s. They have three children: Lara, born in December 1994; John, born in June 2001; and Daniel, born in March 2006. For most of their marriage, Jerry held relatively high-paying investment jobs, while Sally raised their children as a stay-at-home mother.

Jerry was arrested in April 2011 on allegations that he sexually abused Lara repeatedly over an eight-year period. He was indicted the next week on 100 counts of

---

[1] We use pseudonyms throughout this opinion to protect the privacy of family members.

sexual abuse of a minor in the first degree.[2]  In April 2012, however, the superior court dismissed the indictment.  A grand jury soon reindicted Jerry on four counts of sexual abuse.[3]

Within a week of Jerry's April 2011 arrest, Sally filed for divorce.  Alleging that Jerry had "a history of domestic violence and sexual abuse," Sally requested primary physical and sole legal custody of the parties' children and asked the superior court to require that Jerry's contact with the children be supervised.  Jerry denied the claims of domestic violence and sexual abuse and requested joint legal and shared physical custody of the children.  Sally peremptorily challenged the superior court judge originally assigned to the case,[4] and the case was reassigned to Superior Court Judge Philip M. Pallenberg, who also was presiding over Jerry's criminal case.

Early in the proceedings Sally moved for interim attorney's fees and costs, spousal maintenance, and child support.  She noted that she had "been a stay-at-home mother for the last 12 years[] and [was] currently unemployed," while Jerry "earn[ed] over $170,000 per year working for [a state agency]."  Jerry opposed the motion, pointing out that his incarceration prevented him from earning an income.  The superior court determined that it would not award Sally "interim attorney's fees, spousal maintenance, or child support in excess of the minimum amount" if Jerry was no longer receiving income from his previous employer.  But the court allowed Sally "to make

---

[2]    AS 11.41.434(a)(2).

[3]    The grand jury charged Jerry with one count of sexual abuse of a minor in the first degree, AS 11.41.434(a)(2), one count of attempted sexual abuse of a minor in the first degree, *id.*, and two counts of sexual abuse of a minor in the second degree. AS 11.41.436(a)(3).

[4]    *See* Alaska R. Civ. P. 42(c).

reasonable withdrawals [from marital accounts] for attorney's fees and for living expenses."

In response to this order Sally requested a hearing "to address [her] continuing difficulty in accessing marital funds to support herself and the parties' three children, pay all the marital bills, and also to pay her attorney's fees." The superior court granted this request for hearing. The court's subsequent written order specified that Sally "shall promptly be paid one-half of [Jerry's] deferred compensation account, less 25% to be withheld for federal income tax" and "one-half of [Jerry's] [Supplemental Annuity Plan] account, less 35% to be withheld — 25% for federal income tax plus 10% for the early withdrawal penalty." The court informed the parties that it would "hold in abeyance until trial any decision on whether or how the above distributions should affect the overall property distribution."

In November Sally moved for a protective order to stay Jerry's proposed depositions of Sally and Lara and all other discovery in the case until the conclusion of Jerry's criminal proceedings.[5] The superior court granted the motion but clarified that "[t]he issue . . . [was] not *whether* [Jerry would] get[] to take these depositions . . . [but] *when* he may take them — before or after his criminal trial." (Emphases in original.) Because the court concluded that "the primary reason [Jerry] wants to take the depositions now is to defend against the sexual abuse allegations" — that is, *not* to prepare for his civil divorce trial — the court stayed all discovery in the civil case until the resolution of Jerry's criminal case.

In April 2012 Sally asked the superior court for permission to lease the marital residence. Sally claimed both she and Lara had "very strong and very negative

---

[5]     Lara's guardian ad litem joined Sally's motion, and the State also filed a motion in Jerry's criminal case to preclude Jerry from deposing Sally and Lara in the civil case.

associations with the marital home as the location where [Jerry] repeatedly sexually abused [Lara], and verbally and emotionally abused [Sally], over a period of years," which made it "very difficult" for Sally and Lara to continue living there. Sally indicated that by renting a smaller home in downtown Juneau and by leasing out the marital home, she could save about $375 monthly. Over Jerry's objection the superior court granted Sally's request, but limited the lease period to 12 months.

In late 2012 Jerry pleaded guilty to indecent exposure in the first degree.[6] All other charges against him were dismissed.

In March 2013 Jerry —then self-represented — once again sought to depose Sally. Sally moved for a protective order prohibiting the deposition, claiming Jerry would violate his conditions of parole by deposing her. The superior court denied Sally's motion but ordered that the deposition be conducted telephonically. Jerry then sought to videotape the deposition, and when Sally refused to attend a videotaped deposition, Jerry moved to compel her participation, arguing that "video is essential to his understanding of what actually occurred in the room." At a hearing on the matter the court reiterated that Jerry could depose Sally telephonically but "not by videotape." The court also denied Jerry's request to view the deposition via video feed in real time, without recording. Jerry then declined to depose Sally, claiming his inability to view the deposition would prevent him from effectively questioning Sally.

In June Jerry asked the superior court to extend the marital home lease period an additional nine months. Sally opposed this extension and cross-moved for the

---

[6]     *See* AS 11.41.458(a)(1). Indecent exposure in the first degree under subsection (a)(1) is a class C felony whereby an offender (1) "knowingly exposes [his or her] genitals" and (2) "knowingly masturbates" (3) "within the observation of a person under 16 years of age" (4) "with reckless disregard for the offensive, insulting, or frightening effect the act might have." AS 11.41.458; AS 11.41.460(a).

immediate sale of the property. She argued that "being legally and economically tied to a sex offender who has abused one's children is, in and of itself, emotionally damaging and draining." The court granted Sally's cross-motion to sell the residence and denied Jerry's request to extend the lease. Agreeing with Sally's argument, the court concluded that because "[Sally] is the victim of a serious felony offense committed by [Jerry] against the parties' child, I believe it would be entirely inappropriate to force [Sally] to remain in a business relationship with [Jerry] against her will."[7] (Footnote omitted.)

In November Jerry moved to disqualify Judge Pallenberg for bias. Jerry noted that Judge Pallenberg had been exposed to potentially prejudicial information in the criminal case. Jerry further argued that Judge Pallenberg's exposure to this evidence had caused the judge to form opinions about the allegations against Jerry. As a result, Jerry argued, Judge Pallenberg's adjudication of the criminal case created an appearance of bias in the civil proceedings.

Jerry also argued that Judge Pallenberg's decisions in the civil case demonstrated actual bias. Jerry argued that Judge Pallenberg, when ruling on interlocutory orders, ignored Jerry's affidavit-supported denial of all charges while improperly relying on (1) arguments in Sally's briefings that were unsupported by evidence; (2) Sally's accusations against him, which were based in hearsay; and (3) the indecent exposure conviction. Jerry also took issue with the court's conclusion that Sally met the legal definition of "victim." And Jerry complained that the court had demonstrated bias in favor of Sally by ordering the sale of the marital home and by

---

[7]     The superior court concluded that Sally met the definition of "victim" in AS 12.55.185(19).

prohibiting him from deposing her in person or by video. The superior court denied Jerry's disqualification motion, and the reviewing court affirmed this denial.[8]

The superior court held a trial in January 2014. At the outset the parties stipulated to a child custody agreement awarding Sally sole legal and primary physical custody of John and Daniel.[9] Sally agreed to keep John and Daniel in counseling until she was advised by the counselor that counseling was no longer necessary. The parties also stipulated to the value of many of the couple's most significant assets and debts; the property stipulation did not, however, cover the parties' vehicles or household goods. And it did not address

> how the property should be divided[,] the economic impacts of the divorce[,] . . . the characterization of the property[,] . . . [or the] characteriz[ation] [of] property already distributed to the parties, . . . in particular whether property distributed to [Sally] post-separation should be considered as a property distribution as opposed to spousal and child support.

Because of the parties' custody agreement and property stipulation, the issues at trial were limited to the classification of property, the valuation of the items not covered by the stipulation, and the equitable division of the marital estate.

The property division issue was the most contentious. Sally presented testimony suggesting that Jerry was capable of finding high-paying work and was living inexpensively off the generosity of his mother, while Sally was struggling as a working mother to support her children's needs. Accordingly, she argued a disproportionate

---

[8] Under AS 22.20.020(c) every order denying a motion for disqualification is assigned to another judge for review.

[9] By this time Lara had reached the age of majority and therefore was not affected by the custody agreement.

division of the marital property in her favor would be equitable.[10] Jerry presented testimony that he was unable to find lucrative work because potential employers inevitably discovered his sexual offender status and because the Financial Industry Regulatory Authority's rules prohibited him from working in his former field, that Sally's financial irresponsibility was the cause of her financial struggles, and that a 50-50 property division would be equitable because his financial situation was now worse than Sally's situation. The parties also disputed whether Sally's pretrial withdrawals from marital accounts should be treated as spousal maintenance or as advances against the property distribution.

The parties also disagreed about the classification and treatment of the education savings accounts they had set up for their children. Sally asked that the accounts be set aside and exempted from the property division. Jerry contended that the accounts were marital property and should be treated as such.

In August the superior court entered a memorandum decision and order. The court concluded that under the AS 25.24.160(a)(4) factors[11] "the only fair and equitable division of property is one that is distributed unevenly in [Sally's] favor." The court reasoned that "a party who commits a serious crime which destroys his ability to earn a living *has* committed economic misconduct" and that Jerry should not be legally rewarded in the property division for the effects his conviction had on his financial circumstances. (Emphasis in original.) The court also determined that the sharp reduction in household income — through no economic fault of Sally — and Sally's child-care responsibilities strongly supported a property division award in her favor. With regard to Sally's withdrawals from marital accounts, the court concluded that such

---

[10]     *See* AS 25.24.160(a)(4).

[11]     *See also Merrill v. Merrill*, 368 P.2d 546, 547 n.4 (Alaska 1962).

pretrial depletion of marital assets may be factored into the property division only if the depletion was unreasonable; the court found that Sally had not misused the funds made available to her between separation and trial. Accordingly, the superior court awarded Sally about 70% of the marital estate and did not recapture her previous withdrawals of marital funds.

With regard to the education savings accounts, the superior court concluded that "they remain[ed] the property of the parents" and were "technical[ly] . . . marital property." But the court found that "the act of establishing [an education savings] account constitutes an agreement between the parties to set these funds aside for the children's education." The court further reasoned that "the children should not suffer more than they already have by having their college funds plundered to meet their parents' needs." Accordingly, the court excluded these accounts from the property division and granted Sally management authority over them. But the court provided that "[n]o funds shall be withdrawn from those accounts other than for the child[ren]'s educational expenses except by agreement of both parties or by order of the court."

The superior court denied Sally's request for attorney's fees. It acknowledged that Jerry "paid a very large sum for representation by counsel during the preliminary stages of this case," funded primarily by loans from his mother, and that "[Jerry] was not represented at all" through most of the proceedings and at trial. Quoting from our opinion in *Lone Wolf v. Lone Wolf*, the superior court found that because attorney's fees awards in divorce cases are intended to "assure that both spouses have the proper means to litigate [a] divorce action on a fairly equal plane"[12] and because

---

[12]     *Lone Wolf v. Lone Wolf*, 741 P.2d 1187, 1192 (Alaska 1987).

"ordering an unrepresented party to pay the other party for their lawyer would seem to make the playing field less level," granting Sally attorney's fees was inappropriate.[13]

Jerry moved for reconsideration of the property division order. He argued that the superior court had "improperly considered moral fault with respect to [his] future earnings and financial circumstances," that his due process rights had been violated throughout the proceedings, that the property division should have accounted for Sally's withdrawal of marital assets and included the education savings accounts, and that Judge Pallenberg was biased against him.[14] The court summarily denied the motion for reconsideration but treated the bias claim as a renewed request for disqualification, which it also denied. The reviewing court affirmed the denial of this second disqualification motion.

Jerry appeals.

## III. STANDARD OF REVIEW

Although we review the denial of a motion to disqualify a judge based on actual bias for abuse of discretion,[15] "we independently review a request for

---

[13] At trial, Jerry also made a brief request for attorney's fees in his closing argument. The superior court appears to have overlooked Jerry's attorney's fees request and did not rule on the issue. Jerry does not raise it here.

[14] Jerry made a number of additional claims that are not listed here because he did not renew them on appeal.

[15] *Greenway v. Heathcott*, 294 P.3d 1056, 1062 (Alaska 2013) (citing *Wasserman v. Bartholomew*, 38 P.3d 1162, 1170 (Alaska 2002)).

disqualification of a judge based on the appearance of impropriety."[16] However, where a party asserts only "an *appearance* of partiality, as distinguished from actual bias, we require the complaining party to make a 'greater showing' for reversal."[17]

We review the superior court's decision to stay discovery for abuse of discretion,[18] though we use our "independent judgment to determine whether [the superior] court has applied the correct legal test."[19]

"We review the superior court's property division for abuse of discretion," but an order to recapture marital assets spent between separation and trial is not justified without specific findings, based on evidence, that "the assets in question were actually wasted, dissipated, or converted to non-marital form."[20]

We "review constitutional questions de novo, and will adopt the rule of law that is most persuasive in light of precedent, reason, and policy."[21]

---

[16]     *Griswold v. Homer City Council*, 310 P.3d 938, 941 (Alaska 2013) (citing *Greenway*, 294 P.3d at 1062-63; *Phillips v. State*, 271 P.3d 457, 459 (Alaska App. 2012)).

[17]     *Carr v. Carr*, 152 P.3d 450, 459 (Alaska 2007) (emphasis added) (quoting *Long v. Long*, 816 P.2d 145, 156 (Alaska 1991)).

[18]     *Armstrong v. Tanaka*, 228 P.3d 79, 82 (Alaska 2010); *see also* Alaska R. Civ. P. 26(c) ("[T]he court in the judicial district where the deposition is to be taken may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense . . . .").

[19]     *Armstrong*, 228 P.3d at 82.

[20]     *Day v. Williams*, 285 P.3d 256, 260 (Alaska 2012).

[21]     *Garibay v. State, Dep't of Admin., Div. of Motor Vehicles*, 341 P.3d 446, 448 (Alaska 2014) (quoting *Alvarez v. State, Dep't of Admin., Div. of Motor Vehicles*, 249 P.3d 286, 291 (Alaska 2011)).

## IV.  DISCUSSION

### A.  The Proceedings Did Not Create An Appearance Of Judicial Bias.

The superior court twice denied Jerry's motions for disqualification, and the reviewing court affirmed the decision in both cases.  Jerry argues that the superior court erred by denying these motions, citing a "[s]et of facts" which he claims demonstrate an "appearance of [judicial] bias."[22]  For the reasons discussed below, Jerry has not demonstrated an appearance of bias by Judge Pallenberg, and we reject Jerry's bias claims.[23]

#### 1.  Judge Pallenberg's role as judge in both the civil and criminal cases does not give rise to an appearance of bias.

Jerry argues that Judge Pallenberg's exposure to evidence in the criminal case influenced his decisions in the civil divorce proceedings.  Jerry notes that while presiding over the criminal prosecution, Judge Pallenberg both heard testimony from Sally and Lara that was never introduced in the civil case and was exposed to statements by Jerry that were later suppressed as illegally obtained.  Jerry argues that Judge Pallenberg improperly relied on this evidence in his adjudication of the civil dispute.

---

[22]    Although Jerry alleged actual bias in his motions for disqualification, he did not renew this claim on appeal.

[23]    Jerry makes several claims that he did not raise in his motions for disqualification.  Specifically he claims that Judge Pallenberg failed to keep the two cases "procedurally and substantively separate," that he "appear[ed] to act as an advocate for [Sally]," and that he "express[ed] . . . a fixed opinion about dispositive facts" before hearing any evidence.  Because these claims were not raised before the superior court, we consider them only for plain error, and find none. *See Patterson v. GEICO Gen. Ins. Co.*, 347 P.3d 562, 570 (Alaska 2015) (quoting *Swaney v. Granger*, 297 P.3d 132, 136 (Alaska 2013)).

When presiding over separate but related proceedings, a judge inevitably will be confronted with evidence in one proceeding that is irrelevant or inadmissible in the other. But we repeatedly have held that a judge has no obligation to order disqualification merely because he or she presided over a related proceeding or case.[24] We recently noted:

> Trial judges are often called upon to compartmentalize their decisions — to review evidence that is later declared to be inadmissible or to rule on similar legal issues at different stages of a contested case. Generally, these decisions do not create an appearance of impropriety unless the judge hears something or does something so prejudicial that further participation would be unfair to the parties.[25]

### a. The superior court properly relied on Jerry's conviction for indecent exposure.

Jerry first contends that Judge Pallenberg "consistently relied upon [his] belief that [Jerry] committed the crime of indecent exposure" despite a lack of "evidence admitted in the divorce case that [Jerry] committed [that] crime." But evidence of that offense *was* introduced in the civil case, because the superior court took judicial notice of Jerry's indecent exposure conviction.[26]

---

[24] *See, e.g.*, *Carr v. Carr*, 152 P.3d 450, 459-60 (Alaska 2007); *Lacher v. Lacher*, 993 P.2d 413, 420-21 (Alaska 1999); *R.J.M. v. State, Dep't of Health & Soc. Servs.*, 946 P.2d 855, 869-70 (Alaska 1997), *superseded by statute on other grounds*, Ch. 99, §§ 1, 18, SLA 1998, *as recognized in Rowan B., Sr. v. State, Dep't of Health & Soc. Servs.*, 320 P.3d 1152, 1158 n.24 (Alaska 2014).

[25] *Grace L. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 329 P.3d 980, 988-89 (Alaska 2014).

[26] *See Lane v. Ballot*, 330 P.3d 338, 342 n.16 (Alaska 2014) ("Courts may take judicial notice of criminal convictions pursuant to Alaska Rules of Evidence 201 and 203."); *see also* Alaska R. Evid. 201(c) ("A court may take judicial notice . . .
(continued...)

Jerry acknowledges the superior court's reliance on his indecent exposure conviction, but he argues that the court was not "allowed to use judicial notice to establish that [he] had committed the acts for which he was convicted." This is incorrect. As we recently reiterated: "A criminal conviction for a serious crime has a collateral estoppel effect in a subsequent civil action relying on the same set of operative facts. Thus 'a criminal conviction . . . could be introduced as conclusive proof (rather than merely persuasive evidence) of the facts necessarily determined.' "[27]

However, Jerry correctly notes that collateral estoppel does not automatically apply. We have adopted three prerequisites to the imposition of collateral estoppel: (1) the criminal conviction must have been for a serious criminal offense; (2) the defendant must have had a full and fair hearing; and (3) the issue on which the judgment is offered must have been necessarily decided in the previous trial.[28] Since there can be no dispute that Jerry was convicted of a serious criminal offense, which includes any felony,[29] Jerry takes issue with the two latter requirements.

---

[26]    (...continued)
whether requested or not."); Alaska R. Evid. 203(b) ("Judicial notice may be taken at any stage of the proceeding.").

[27]    *Lane*, 330 P.3d at 341 (footnote omitted) (quoting *Lamb v. Anderson*, 147 P.3d 736, 739 (Alaska 2006)); *Wyatt v. Wyatt*, 65 P.3d 825, 831-32 (Alaska 2003). The fact that Jerry pleaded guilty instead of being convicted by a jury is irrelevant, since "[a] nolo contendere or guilty plea has the same effect as a conviction following trial." *Lane*, 330 P.3d at 341 n.9 (citing *Lamb*, 147 P.3d at 744).

[28]    *Scott v. Robertson*, 583 P.2d 188, 191-92 (Alaska 1978); *see also Lamb*, 147 P.3d at 739-42 (discussing the expansion of *Scott* to a wider variety of contexts).

[29]    *See Howarth v. State*, 925 P.2d 1330, 1334 (Alaska 1996) ("[F]elonies are always serious offenses.").

First, Jerry argues that collateral estoppel cannot be applied if there are "indicia of irregularity" surrounding the conviction,[30] and he claims that such indicia are present because his conduct did not satisfy all elements of the crime of indecent exposure in the first degree. But we have not held that *any* "indicia of irregularity" can prevent the application of collateral estoppel; rather "a criminal conviction . . . should be admissible absent *strong showing* of irregularity."[31]

Jerry does not claim he was denied a full and fair hearing with regard to his guilty plea.[32] Indeed, Jerry was represented by counsel throughout his criminal proceedings, and he does not contend that he was involuntarily coerced into pleading guilty. Instead, Jerry argues that the State's stipulation at a post-sentencing hearing that "there were no witnesses to . . . the particular crime he pled guilty to" invalidates one of the elements of his offense — that he masturbated "within the *observation* of a person under 16 years of age."[33] (Emphasis in original.) However, Jerry did not appeal his criminal conviction in light of the State's "no witnesses" stipulation.[34] Considering that

---

[30]    *See Lamb*, 147 P.3d at 744.

[31]    *Id.* (quoting *Scott*, 583 P.2d at 192 (omission in original) (emphasis added)).

[32]    *See Bearden v. State Farm Fire & Cas. Co.*, 299 P.3d 705, 711-12 (Alaska 2013); *Lamb*, 147 P.3d at 744; *Scott*, 583 P.2d at 192.

[33]    AS 11.41.458(a). Neither we nor the court of appeals has ever evaluated whether "within the observation" means "observation range" or "actual observation," and the pattern jury instruction's use note explicitly highlights the lack of clarity on this issue and takes no position on "whether the child . . . must observe the act of masturbation." *See* Alaska Crim. Pattern Jury Instruction No. 11.41.458 (rev. 2009).

[34]    *Cf. Lyman v. State*, 824 P.2d 703, 705 (Alaska 1992) ("If the prior decision is reversed on appeal, a party always may institute a direct action under [Alaska] Civil
(continued...)

Jerry made this decision while fully represented in the criminal case, he should not be allowed to deny the conviction and its underlying elements now.

Second, Jerry argues that the "essential elements of the offense" of indecent exposure under AS 11.41.458 greatly limit the adverse inferences the court was allowed to make. He claims that the offense is one of "recklessness," so "any assumption of intent or deviancy may not be collaterally estopped." But two elements of his conviction were (a) "*knowingly* masturbat[ing]" while (b) "*knowingly* exposing [his] genitals in the presence of another person."[35] Jerry's claim that knowingly masturbating in the presence of a young child does not constitute deviant behavior is simply not colorable, hence AS 11.41.458's classification as a sexual offense.[36]

Jerry also claims that "since the elements [of indecent exposure] do not require that the crime be against a member of the family or be in the family home, these facts may not be collaterally estopped." But collateral estoppel by criminal conviction may be used in a civil case to prove that the offender committed the crime against a particular person,[37] and there is no dispute that the "[]other person" referenced in the

---

[34]    (...continued)
Rule 60(b)(5) to vacate the judgment that rested on the preclusive effect of the earlier reversed judgment." (quoting *Holmberg v. State, Div. of Risk Mgmt.*, 796 P.2d 823, 829 (Alaska 1990))).

[35]    AS 11.41.458(a) (emphasis added); AS 11.41.460(a) (emphasis added).

[36]    *See* AS 12.63.100(6)(A) (" '[S]exual offense' has the meaning given in AS 11.41.100(a)(3)."); AS 11.41.100(a)(3) (" '[S]exual offense' means an offense defined in AS 11.41.410–11.41.470.").

[37]    *See, e.g.*, *Lane v. Ballot*, 330 P.3d 338, 342-43 (Alaska 2014) (affirming introduction of criminal conviction to show that defendant sexually assaulted plaintiff); *Lamb*, 147 P.3d at 739-44 (affirming introduction of criminal conviction to show that defendant driver struck and injured plaintiff); *Scott*, 583 P.2d at 190-94 (same).

elements of Jerry's conviction was Lara. Moreover, none of the court's decisions turned on the fact that the offense occurred in the family home.[38]

For these reasons, the superior court was well within its discretion to take judicial notice of Jerry's conviction in the criminal case and to rely on that conviction as conclusive evidence that Jerry committed the crime of indecent exposure in the first degree against Lara.

> **b.     The superior court did not rely or appear to rely on a belief that Jerry also committed sexual abuse.**

Jerry also claims that the superior court relied on a belief that he committed the separate crime of sexual abuse of a minor. Specifically, Jerry notes that in granting Sally's request to sell the marital home, Judge Pallenberg stated:

> [Sally] makes the following statement, with which the superior court agrees: "[Sally] is entitled to be free of [Jerry] at the earliest opportunity, and that includes not being wed in any fashion to the house where the sex abuse occurred." . . . *Under the circumstances, where* [*Sally*] *is the victim of a serious felony offense committed by* [*Jerry*] *against the parties' child*, I believe it would be entirely inappropriate to force [Sally] to remain in a business relationship with [Jerry] against her will.

(Emphasis added.) (Footnote omitted.) Jerry interprets this statement to mean Judge Pallenberg fully agreed with Sally that Jerry committed sexual abuse against Lara in the marital home. But Judge Pallenberg immediately reframed Sally's claim against Jerry to match the actual conviction. Judge Pallenberg's statement meant that he agreed with

---

[38]     As discussed below, the court merely quoted Sally's claim that Jerry sexually abused Lara in her bedroom.

Sally's general point that she was entitled to be free of Jerry and that his agreement stemmed from the fact Jerry committed "a serious felony offense . . . against the parties' child."

Critically, Judge Pallenberg did not use any variant of the term "sexual abuse" in his own description of the offense nor did he refer to the multiple offenses originally charged. He relied only on Jerry's indecent exposure conviction in his ruling. And the court's orders throughout the civil case turned on the lone indecent exposure offense, not the other accusations of sexual abuse.

### c. The superior court's treatment of Sally as a "victim" did not give rise to an appearance of bias.

Jerry also argues that Judge Pallenberg used Sally's status as a "victim" in the criminal dispute[39] to "afford special status in the divorce proceeding." Specifically, Judge Pallenberg referenced Sally's "victim" status when granting her request to sell the marital home and when partially granting her request for a protective order. But Judge Pallenberg thoroughly explained his reasoning in the order denying Jerry's first disqualification motion:

> I believe it is fair to consider, in making a decision about whether the marital home should be sold, the fact that one of the spouses committed a crime of a somewhat sensitive nature against the parties' child in the home. Similarly, I believe it was fair to consider, in ruling on the motions concerning the deposition of [Sally], the nature of [Jerry's] criminal conviction.

Whether Judge Pallenberg correctly interpreted AS 12.55.185(19)(B) and applied it to this case is irrelevant to Jerry's bias claim. Judge Pallenberg provided a plausible explanation for his legal reasoning that did not depend on information gleaned from the

---

[39] *See* AS 12.55.185(19)(B) (If a person "against whom an offense has been perpetrated" is a minor, "victim" means "a parent . . . of the person.").

criminal trial.[40]  Even if Judge Pallenberg's reasoning was incorrect, "the fact that a judge commits error in the course of a proceeding does not automatically give rise to an inference of actual bias."[41]  Judge Pallenberg's decisions on this matter do not demonstrate bias.

### d. The superior court's statements in the criminal proceeding do not indicate bias.

Relatedly, Jerry argues that Judge Pallenberg made statements in the criminal case that suggest bias against him.  But — critically — Jerry does not point to any specific incidents where Judge Pallenberg's views from the criminal case "might have carried over and actually influenced the judge's decisions on the matters at stake in the divorce proceedings."[42]  Therefore this argument also fails.

### 2. Judge Pallenberg's out-of-court contacts with Sally and Daniel do not give rise to an appearance of bias.

At Jerry's criminal sentencing hearing Judge Pallenberg told the State's and Jerry's attorney at a bench conference that his son and Daniel recently had been in a swim class together, and that he occasionally saw Sally when picking up his son from the pool but did not interact with her.  Judge Pallenberg went on to say that he "didn't think [these contacts] had any significance until I read all the materials [and read that] there was discussion in some of the letters and elsewhere of [Daniel's]

---

[40]    *Cf. Carr v. Carr*, 152 P.3d 450, 460 (Alaska 2007) ("Judge Smith's written decision denying Kelly's recusal motion thoroughly explained the judge's basis for refusing to remove himself from the case and persuasively refuted Kelly's accounting of actual and apparent bias.").

[41]    *Perotti v. State*, 806 P.2d 325, 328 (Alaska App. 1991) (citing *State v. Anchorage*, 513 P.2d 1104, 1112 (Alaska 1973)); *see also Newcomb v. State*, 800 P.2d 935, 942 (Alaska App. 1990).

[42]    *Carr*, 152 P.3d at 459.

behaviors, . . . [which] I suppose . . . may have some relevance for sentencing." Jerry's lawyer responded by stating, "That's fine." Jerry himself did not overhear this disclosure and attests that he read the transcript of the proceeding for the first time while preparing his appellate briefing.

Jerry concedes that "these facts . . . likely would not require recusal" in the criminal case, but he notes that Judge Pallenberg did not make this disclosure in the civil case wherein "[Sally's] parenting acumen and [Daniel's] mental health were highly relevant." (Footnote omitted.) Jerry claims, first, that Judge Pallenberg's contacts with Daniel and Sally "give[] a strong . . . appearance of bias" and, second, that Judge Pallenberg's alleged "failure to comply with the Code of Judicial Conduct disclosure requirements [is] a factor indicative of bias requiring disqualification."[43]

Canon 3(E)(1)(a) of the Alaska Code of Judicial Conduct provides that "a judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including . . . where . . . the judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of disputed evidentiary facts concerning the proceeding." But "a judge has an obligation not to order

---

[43]     Jerry did not raise this issue in his two motions for disqualification. Nevertheless we do not treat this issue as waived, because Jerry attests that he did not have notice of this conversation until he was preparing his appellate briefing. *See Vent v. State*, 288 P.3d 752, 755 (Alaska App. 2012) (addressing a claim of error that was not raised before the superior court because appellant only learned of the error after the superior court issued its written decision).

disqualification 'when there is no occasion to do so,' "[44] and Judge Pallenberg's inadvertent contacts with Daniel and Sally are not nearly significant enough to warrant recusal or reversal.

Recently in *Phillips v. State* the court of appeals reviewed an order denying disqualification where the trial judge knew the victim's sister, lived in the same neighborhood as her, and attended a social event at her house.[45] In reviewing the judge's decision to deny disqualification, the court of appeals noted: "[I]t is generally agreed that the mere fact that a judge maintains an ordinary social relationship . . . either with [one or more] parties to the proceeding or with the attorneys . . . does not provide a valid basis for disqualifying that judge from presiding over proceedings involving [these] persons."[46] Likewise, "the fact that the judge may [be] acquainted with [the alleged] victim of the crime [the] defendant [is] accused of committing is generally deemed to be insufficient to mandate [the judge's] disqualification."[47] Accordingly, because there was no evidence in the record to support the accusation that the judge's relationship with the victim's sister "exceeded mere social acquaintance or social friendship," the court concluded that there was no appearance of bias.[48]

---

[44]     *Grace L. v. State, Dep't of Health & Soc. Servs, Office of Children's Servs.*, 329 P.3d 980, 988 (Alaska 2014) (quoting *Amidon v. State*, 604 P.2d 575, 577 (Alaska 1979)).

[45]     271 P.3d 457, 462 (Alaska App. 2012).

[46]     *Id*. at 469-70 (alterations in original) (quoting RICHARD E. FLAMM, JUDICIAL DISQUALIFICATION: RECUSAL AND DISQUALIFICATION OF JUDGES 195 (2d ed. 2007)).

[47]     *Id*. at 470 (alterations in original) (quoting FLAMM, *supra* note 46, at 206).

[48]     *Id*.

Here the appearance of bias claim stems from Judge Pallenberg's disclosure in the criminal case that his son was in the same swim class as Daniel and that he had observed Sally picking Daniel up from the pool. But nothing in the record suggests that Judge Pallenberg had any direct interactions with either Sally or Daniel, and Judge Pallenberg noted that he "stayed at the far end of the . . . waiting area" and avoided interacting with Sally. This "relationship" between Judge Pallenberg and Sally or Daniel was far less significant that the relationship between the judge and the victim's sister in *Phillips* and would not cause reasonable people to doubt Judge Pallenberg's ability and willingness to be fair.

Jerry also argues that, regardless of the appearance of bias, Judge Pallenberg gained "personal knowledge of disputed evidentiary facts concerning the proceeding" from observing Daniel's behavior and Sally's parenting abilities. He claims that both Daniel's mental health and Sally's parenting abilities were disputed facts in the case. But though the property division decision implicitly referenced Daniel's mental health, it did so only in passing and did not make a finding about whether Daniel has a mental illness. Moreover the record does not support Jerry's claim that Judge Pallenberg gained personal knowledge about Daniel's mental health.[49] And Sally's parenting abilities were not at issue in this case because the parties reached a *pretrial* custody agreement which gave Sally sole legal and primary physical custody.

Because there is no evidence that Judge Pallenberg gained personal knowledge that was relevant to a disputed fact in the proceedings here, Judge Pallenberg had no duty to disclose the swimming pool incidents to Jerry in the civil setting. We conclude that Jerry's "extrajudicial contacts" claim has no merit.

---

[49]    Judge Pallenberg stated only that his son was in the pool with Daniel and that the children "were friendly with each other . . . [but] never had any associations away from the pool."

**3.     The attenuated connection between this case and a government official does not give rise to an appearance of bias**.

Jerry alleges that in November 2011 Sally sent a letter to a government official, which outlined the sexual abuse charges against Jerry and asked the official to personally intervene in the case.  Later, during the divorce proceedings, Sally began working in the official's office.  Jerry theorizes that because Judge Pallenberg previously applied for a Supreme Court opening and because the official played a part in the judicial nomination process, Judge Pallenberg had an incentive to favor Sally in the proceedings to gain the official's favor.  Jerry believes "a reasonable person would assume that the court's career aspirations might result in an inability to [act impartially]."

But the Supreme Court vacancy to which Jerry refers was filled in January 2013, and Sally did not begin working in the official's office until January 2014.  It is therefore unclear how this attenuated connection could possibly have affected Judge Pallenberg's decision-making process.  If Jerry means to argue that the possibility of a *future* vacancy led to the appearance of impropriety, the superior court correctly pointed out that one would need to assume "that there will be a future supreme court vacancy while [the official] remains in office, that [Judge Pallenberg] would apply for the position, that Sally continues to work for the [official] at that time, and that [the official] consults with his receptionist on judicial appointments."  We agree that these "speculative assumptions" would not lead a reasonable person to question the court's impartiality, and we reject this claim of bias.

**4.** **The superior court's legal errors do not give rise to an appearance of bias**.

Finally, although Jerry acknowledges that adverse rulings alone are not sufficient to require recusal,[50] he claims the legal errors he alleges elsewhere in his brief create an appearance of bias. While Jerry is correct that the superior court erred in certain respects, as discussed below, none of the court's decisions was so arbitrary as to create "a perception that the judge's ability to carry out judicial responsibilities with integrity, impartiality[,] and competence [was] impaired."[51] Therefore, we also reject this claim of bias.

**B.** **Jerry's Claims Relating To The Superior Court's Discovery Rulings Are Waived.**

At the request of Sally and the State, the superior court delayed discovery in the civil divorce case until the resolution of the criminal case. The court also granted Sally's subsequent request for a protective order specifying that Jerry's deposition of her could be conducted only telephonically and without video recording. Jerry argues that the court erred by delaying his opportunity to depose Sally and that it abused its discretion by limiting the means by which he could conduct discovery.

The party alleging error bears the burden of showing the error was prejudicial.[52] Because Jerry ultimately declined to depose Sally, he has not met his burden. Jerry has not shown that the superior court's requirement of a telephonic

---

[50]    *See Labrenz v. Burnett*, 218 P.3d 993, 1002 (Alaska 2009) ("[W]e have repeatedly cautioned [that] 'judicial bias should not be inferred merely from adverse rulings.' " (quoting *Tillmon v. Tillmon*, 189 P.3d 1022, 1027 n.13 (Alaska 2008))).

[51]    *Id*. (quoting *Ogden v. Ogden*, 39 P.3d 513, 516 (Alaska 2001)).

[52]    *Zamarello v. Reges*, 321 P.3d 387, 392 (Alaska 2014) (quoting *Heinrichs v. Chugach Alaska Corp.*, 250 P.3d 535, 535 (Alaska 2011)); *see also* Alaska R. Civ. P. 61 (harmless error).

deposition was prejudicial because he has not shown how such a deposition would have differed from a videotaped deposition, or a deposition he was able to watch via video feed.[53] Without knowing what testimony Sally would have given, it is impossible for us to determine how Jerry's "substantial rights"[54] were affected by the superior court's requirement, if at all. Similarly, we have no way to determine how taking Sally's deposition after the criminal trial would have prejudiced Jerry. Because Jerry has not shown that the alleged error was prejudicial, we reject this claim.

## C. The Superior Court Did Not Err By Permitting The Sale Of The Marital Home.

In July 2013, after Jerry pleaded guilty to indecent exposure but before the divorce trial, Sally asked the superior court for permission to sell the marital home. She argued that the sale would quicken the "complete economic separation of the parties" and "provide some level of economic support for [their] children." She later added that "being legally and economically tied to a sex offender who has abused one's children is, in and of itself, emotionally damaging and draining. " Jerry opposed the pretrial sale and requested that the property continue to be leased. He argued that Sally was "unlikely to be awarded the marital home" under the AS 25.24.160(a)(4) factors and that it was "not in the best interest of the children to rush the home sale."

The superior court granted Sally's motion, concluding that because "[Sally] is the victim of a serious felony offense committed by [Jerry] against the parties' child, I believe it would be entirely inappropriate to force [her] to remain in a business

---

[53] *See State ex rel. Anderson v. Miller*, 882 P.2d 1109, 1113 (Or. 1994) (noting that even if a party subject to a protective order conducted a non-videotaped deposition, "[a]n appellate court would have difficulty assessing what different impact a videotaped deposition may have had on a jury").

[54] Alaska R. Civ. P. 61.

relationship with [Jerry] against her will." (Footnote omitted.) The court also noted that Jerry likely would be unable to provide significant child support, which meant Sally likely would be favored in the property division and Jerry likely would not be awarded the home. Moreover, the court pointed out that Jerry did not state a desire to *live* in the marital home and instead sought permission to continue leasing out the property. As a result, the court concluded that the circumstances of the case were "unusual" and justified a pretrial sale of the property.

In *Watega v. Watega* we held that "[w]hile AS 2[5].24.140(b)(6) does not provide any limitation on a court's ability to permit a sale of marital property, . . . courts do not have unlimited discretion to permit the sale of marital property prior to the division of the property in a divorce judgment."[55] Such a pretrial sale should be allowed "sparingly and only for pressing reasons, such as for the prevention of waste of marital assets."[56] We concluded that protecting a party's credit was "not a sufficiently strong reason to justify a court-authorized sale over [that party's] objection" to the sale when the "sale of the property did nothing to increase or preserve the assets of the marital estate."[57]

The superior court correctly concluded it was presiding over "an unusual divorce case," and Jerry is incorrect that there was no evidence to support Sally's motion for permission to sell the home. Sally claimed in her complaint that Jerry had "a history

---

[55] 143 P.3d 658, 663 (Alaska 2006) (citing *Randazzo v. Randazzo*, 875 A.2d 916, 924 (N.J. 2005)). Alaska Statute 25.24.140(b)(6) provides that the superior court may issue a "necessary protective order[] . . . prohibiting a spouse from disposing of the property of either spouse or marital property without the permission of the other spouse or *a court order*." (Emphasis added.)

[56] *Watega*, 143 P.3d at 663.

[57] *Id*. at 664.

of domestic violence and sexual abuse," and she submitted an affidavit noting that Jerry had been arrested for sexual abuse of a minor. By the time the court authorized the sale of the marital residence, Jerry had pleaded guilty to indecent exposure in the first degree for the act of masturbating in Lara's presence. Jerry was collaterally estopped from denying this act, for the reasons discussed above.[58] On these facts alone, it was reasonable for the court to infer that Sally would wish to separate herself from business relationships with him.

Moreover the superior court was correct that there was little reason to delay the sale. Neither party was living in the residence. Jerry presented no evidence that Sally would sell the home for an unreasonably low amount. Accordingly, the superior court did not abuse its discretion in allowing Sally to sell the marital residence before trial.

### D.    Division Of Property

The equitable division of marital assets involves a three-step process: "(1) deciding what specific property is available for distribution, (2) finding the value of the property, and (3) dividing the property equitably."[59] The parties stipulated to the values of most of their assets, and Jerry does not contest the superior court's valuation of the remaining assets. Instead he argues that the court erred by failing to recapture money Sally spent between separation and trial and that the court abused its discretion by awarding the majority of the marital estate to Sally.

---

[58]    *See supra* notes 26-38 and accompanying text.

[59]    *Beals v. Beals*, 303 P.3d 453, 458 (Alaska 2013) (citing *Doyle v. Doyle*, 815 P.2d 366, 368 (Alaska 1991)); *Wanberg v. Wanberg*, 664 P.2d 568, 570 (Alaska 1983).

### 1. Determination of property available for distribution

#### a. The superior court properly interpreted the parties' property value stipulation.

Jerry argues that the superior court "disregard[ed] the parties' property stipulation" by failing to use the stipulated values for the assets Sally already had withdrawn and for the credit card debt Jerry already had paid. Jerry claims that the "stipulation limited the court's discretion to determining whether 'property distributed to [Sally] post-separation should be considered as a property distribution as opposed to spousal and child support.' "

But far from disregarding the stipulation, the superior court cited it, quoted it, relied upon its values, and provided an explanation whenever it deviated from those values. Furthermore the stipulation in no way limited the court's discretion in characterizing and allocating the marital property. To the contrary, the stipulation provided that "the court *may* use the [attached] property values . . . as the basis for its allocation of marital property and debts" and left the parties "free to make arguments to the court concerning how the property should be divided; the economic impacts of the divorce; or the characterization of the property." (Emphasis added.)

The stipulation also made clear that there was "no agreement as to how the court should characterize property already distributed" to Sally — the assets Jerry most heavily contests in this appeal. And the statement that there was "no agreement [between the parties] . . . as to whether the property distributed to [Sally] post-separation should be considered as a property distribution as opposed to spousal and child support" does not mean that the parties agreed that the property must be treated as one or the other.

In short, the actual stipulation and Jerry's interpretation of it bear little resemblance to one another. The superior court's order correctly applied the stipulation. We reject this claim.

**b.** **The superior court erred by treating Sally's attorney's fees as marital expenses.**

After the September 2011 hearing, the superior court authorized Sally to withdraw funds from a supplemental annuity plan and a deferred retirement account to pay for living expenses and attorney's fees. In its property division decision, the court noted that it had informed the parties it would postpone the characterization of the accounts and the treatment of Sally's withdrawals until trial. The court also noted that it had summarized the legal framework for the treatment of these funds at the September 6 hearing. Citing *Day v. Williams*,[60] the court concluded that it could not "recapture" already-spent funds and credit them in the property distribution absent a finding that Sally had "wasted or otherwise improperly used the funds." Jerry argues that it was inappropriate to apply *Day* to this case because already-spent funds may be "properly included in the final property division [where the] property was provided with the understanding that it was an allocation of marital property." He cites *Sandberg v. Sandberg* for this proposition.[61]

Jerry's argument that the court should have relied upon *Sandberg* instead of *Day* is unpersuasive. Unlike *Sandberg*, the parties did not reach a "binding settlement agreement" that specified how the distribution in question should be characterized and treated.[62] To the contrary their property values stipulation expressly reserved these issues for trial, as discussed above. Jerry also points to the court's initial order regarding these funds, which stated that Sally's withdrawals from the retirement accounts would be treated as an "advance against the property distribution." But Jerry ignores the

---

[60] 285 P.3d 256 (Alaska 2012).

[61] *See* 322 P.3d 879, 891 n.42 (Alaska 2014).

[62] *Id.*

footnote in that order, which stated that "[t]he court does not intend to rule now on whether there are offsets or credits that may reduce the effective amount of this advance." He also ignores the court's order following the September 6, 2011 hearing, which explicitly stated that "[t]he court will hold in abeyance until trial any decision on whether or how the above distributions should affect the overall property distribution in this case." Because neither the parties' stipulation nor the superior court's orders expressly determined the resolution of this issue, this case bears no similarity to the "unusual circumstances" which justified the superior court's deviation from the *Day* rule in *Sandberg*.[63]

Accordingly the superior court correctly applied *Day* to the facts of this case, at least as a general matter. The court had awarded Sally only the minimum permissible child support amount of $50 per month,[64] and therefore did not abuse its discretion by declining to treat Sally's withdrawals as interim support. And the court found that Sally's post-separation expenses were reasonable and not evidence of waste or misuse, which meant the court was required to value the account as of the date of trial, not the date of separation.

However, Jerry points out that Sally paid pretrial attorney's fees using these funds. The superior court denied Sally's requests for both interim and final attorney's fees, and Sally used about $30,000 of her withdrawals on attorney's fees. But *Day*'s holding applies only to expenditures for "marital purposes or normal living expenses,"[65] and attorney's fees to fund a divorce case qualify as neither a marital nor living expense

---

[63]    *Id.*

[64]    *See* Alaska R. Civ. P. 90.3(c)(3).

[65]    *Day*, 285 P.3d at 264 (quoting *Partridge v. Partridge*, 239 P.3d 680, 692 (Alaska 2010)).

absent a finding that they are necessary "to level the playing field."[66]  We therefore remand this matter to the superior court to reconsider this aspect of the property division.

### c. The superior court had discretion to set the education savings accounts aside for the benefit of the children.

The parties had education savings accounts for their three children with a total value of $56,000.  The court determined that these accounts were "technically the property of the parents and not of the children" and thus "marital property."  But the court also found that "the act of establishing a 529 [education savings] account constitutes an agreement between the parents to set these funds aside for the children's education" and that "the children should not suffer more than they already have by having their college funds plundered to meet their parents' needs."  The court therefore declined to include these accounts in the property distribution, assigned them to Sally to manage, and required that Sally receive permission from Jerry or the court if she wished to use the funds for noneducational purposes.

Jerry argues that the superior court erred by exempting these funds from the normal property distribution.  He cites an out-of-state case[67] as well as Turner's *Equitable Division of Property* treatise[68] to support this claim.  He contends that the court had "no evidence of a joint intention to use the funds for college," and he highlights Sally's statement that the funds were not her "area of expertise."

But Jerry's citations — which suggest that education savings accounts are marital property unless the parents' names are not on the account or the account was set

---

[66]  *Berry v. Berry*, 277 P.3d 771, 779 (Alaska 2012) (quoting *Dragseth v. Dragseth*, 210 P.3d 1206, 1212 (Alaska 2009)).

[67]  *Drumheller v. Drumheller*, 972 A.2d 176 (Vt. 2009).

[68]  BRETT R. TURNER, EQUITABLE DISTRIBUTION OF PROPERTY § 5:15, at 308 (3d ed. 2005).

up as a trust[69] — do not support his full argument, because the superior court agreed that the accounts were "technically" marital property. And Turner's treatise provides the rationale on which the superior court relied: "If the parents' names remain on the accounts, it could still be argued that they own the account in some form of implied trust for the benefit of the children."[70]

Jerry's argument that there was "no evidence of a joint intention to use the funds for college" also is unpersuasive, because creating three education savings accounts for three children is itself evidence that the parties had such intention. Moreover, although Sally testified that she did not have expertise in understanding the *legal* intricacies of the accounts, she also stated that she intended for the accounts to be "designated" for her children's education. Even Jerry testified that "[Daniel] has a 529 plan, and John and Lara have educational IRAs," though he also expressed his willingness to liquidate the accounts in the event of a family emergency. Based on this evidence, the court's finding that the accounts were intended to be used for the benefit of the children was not clearly erroneous. We therefore affirm the superior court's decision to set apart the education savings accounts from the rest of the property division.

### 2. Property distribution

Alaska Statute 25.24.160(a)(4) requires the superior court, in dividing marital property, to "fairly allocate the economic effect of divorce" by considering nine specific factors:

> (A) the length of the marriage and station in life of the parties during the marriage;
>
> (B) the age and health of the parties;

---

[69] *See id.* ("If the parents' names are on the account, and there is neither a trust nor an enforceable contract, the account is marital property.").

[70] *Id.*

(C) the earning capacity of the parties, including their educational backgrounds, training, employment skills, work experiences, length of absence from the job market, and custodial responsibilities for children during the marriage;

(D) the financial condition of the parties, including the availability and cost of health insurance;

(E) the conduct of the parties, including whether there has been unreasonable depletion of marital assets;

(F) the desirability of awarding the family home, or the right to live in it for a reasonable period of time, to the party who has primary physical custody of children;

(G) the circumstances and necessities of each party;

(H) the time and manner of acquisition of the property in question; and

(I) the income-producing capacity of the property and the value of the property at the time of division.

The statute also requires the court to make this division "without regard to which of the parties is in fault."[71]

The court discussed each AS 25.24.160(a)(4) factor in turn and ultimately concluded that "the only fair and equitable division of property is one that is distributed unevenly in [Sally's] favor" because she "will have to shoulder the financial burden of raising the children to adulthood with little child support from [Jerry]." The court noted that Sally had custody of John and Daniel, that both parties' financial circumstances were "drastically lowered" as a result of Jerry's arrest and conviction, and that Sally was not responsible for this reduction in income while Jerry's financial circumstances were "solely a result of the crime he committed." Jerry argues that the superior court clearly

---

[71]     AS 25.24.160(a).

erred by finding that his conviction caused his poor financial situation. Jerry also contends the court committed legal error by considering his moral fault, by dismissing his low earning capacity, and by considering Sally's child-care responsibilities vis-à-vis his likely inability to pay his child support obligation. Accordingly, he claims the court abused its discretion by unevenly distributing marital assets in Sally's favor.

### a. The superior court properly weighed the circumstances and necessities of the parties in dividing the parties' property.

The superior court stated two bases for disregarding Jerry's financial circumstances. First, it found that Jerry's crime constituted economic misconduct and therefore weighed against him under AS 25.24.160(a)(4)(E), which directs the court to consider "the conduct of the parties."[72] Second, when considering "the circumstances and necessities of each party" pursuant to AS 25.24.160(a)(4)(G), the court found that Jerry's low earning capacity was "a self-inflicted wound" and therefore gave his financial circumstances no weight. Because we hold that the court properly considered Jerry's own fault for his financial situation under the "circumstances and necessities" factor, we do not address whether Jerry's crime also constituted economic misconduct.

As an initial matter, Jerry argues that the court clearly erred by concluding that his indecent exposure conviction caused his economic difficulties, which he claims resulted instead from the first-degree sexual abuse charges levied against him and subsequently dismissed. However, this argument is contradicted by his own testimony

---

[72] *See Jones v. Jones*, 942 P.2d 1133, 1139 (Alaska 1997) ("[A] court may take into account economic misconduct under sub[section] (E), but it may not consider a party's moral or legal marital failings which do not amount to economic misconduct.").

at trial, where he claimed he was ineligible to work in the financial services industry because of his conviction. The superior court did not clearly err by agreeing with Jerry that his conviction was a reason for his financial difficulties.

Jerry's primary argument against the division is that any consideration of his crime in the equitable distribution process constituted improper consideration of "moral fault." Jerry is correct that AS 25.24.160(a)(4) requires the court to divide property "without regard to which of the parties is in fault." However, we have construed "fault" in this statute as "moral or legal misconduct which has led to the failure of the marriage."[73] The statute does not require the court to ignore the reasons behind Jerry's "circumstances and necessities." Nor does it prevent the court from considering how Jerry's own conduct caused his financial situation simply because that conduct also may have factored into the failure of the marriage. Rather, the statute requires the court to divide property "without regard to" marital fault; in other words, a court may not tip the equities against a party because it believes that party's moral or legal misconduct was to blame for the marital breakdown.[74]

Jerry also argues that this court "has already ruled that . . . parent[s] may not be held responsible for their lower earning potential due to incarceration." But the holding of *Bendixen v. Bendixen*, which Jerry cites for this proposition, is not nearly as broad as he suggests and addresses only the statutory definition of "voluntary

---

[73] *Jones*, 942 P.2d at 1139 (citing *Hartland v. Hartland*, 777 P.2d 636, 642 (Alaska 1989)); *see also* TURNER, *supra* note 68, § 8.24, at 895 ("Fault is universally defined as *serious* misconduct which causes the marital breakdown or otherwise places a significant burden on the marital relationship.") (emphasis in original).

[74] *See Hartland*, 777 P.2d at 642 ("Under the concept of no-fault divorce, a court cannot rely on one party's fault in ending the marriage to justifying awarding a greater portion of the marital property to the other spouse.").

unemployment" in the child support context.[75]  *Bendixen*'s holding does not automatically apply to every area of family law, as Jerry implies.[76]

The court made detailed findings with respect to each equitable factor, and clearly explained why Jerry's economic circumstances did not weigh in his favor.  The court reasoned:  "In arguing that the court should award him a larger share of the marital estate because of the economic effect of his crime, [Jerry] seems to the court much like a person who burns down his house and then complains that he is homeless."  To award Jerry a greater share of the marital estate as a result would, the court explained, "essentially be rewarding him for his crime."  Accordingly, the court did not consider Jerry's "self-inflicted" loss of income as an equitable point in his favor, and found instead that "the equities [lay] strongly in [Sally's] favor."

This decision was within the court's discretion to make.  The superior court "has wide discretion to ascribe different weights to the[] factors,"[77] and we have repeatedly emphasized the trial court's broad discretion when dividing property.[78]  Here,

---

[75]  962 P.2d 170, 172 (Alaska 1998).

[76]  *See In re J.J.J.*, 718 P.2d 948, 953 (Alaska 1986) ("Circumstances [including incarceration] resulting from the noncustodial parent's own conduct cannot excuse such a parent's significant failure to provide support or maintain meaningful communication."); *see also Ebert v. Bruce L.*, 340 P.3d 1048, 1055 (Alaska 2014) (applying *J.J.J.*'s holding).

[77]  *Cartee v. Cartee*, 239 P.3d 707, 715 (Alaska 2010) (first citing *Veselky v. Veselky*, 113 P.3d 629, 637 (Alaska 2005); then citing *Cox v. Cox*, 882 P.2d 909, 913 (Alaska 1994)).

[78]  *See id.* at 712 ("We review a trial court's equitable division of property between parties at divorce for abuse of discretion, and we will not disturb the result unless it is clearly unjust.") (citing *Walker v. Walker*, 151 P.3d 444, 447 (Alaska 2007)); *id.* at 713 ("Where the trial court makes . . . threshold findings, we generally will not

(continued...)

the court's reasoning and findings fully support its conclusion. It is clear from the court's order that it considered Jerry's crime only insofar as it caused his financial difficulties, and there is no indication that the court considered marital fault in dividing the property or penalized Jerry for committing "moral fault." The court therefore did not abuse its discretion in the way it considered Jerry's financial circumstances.

> **b.** **The superior court's findings are insufficient to support a division based on the needs of the children.**

Jerry argues that the superior court erred by basing its property division in part on Sally's child-care responsibilities and Jerry's expected low future child support payments. Jerry is correct that child support and property division are generally "separate and distinct . . . questions."[79] But the superior court may consider child support issues in the property division when there is "a specific reason why [the needs of the children] cannot be met with an award of child support alone."[80]

Here the superior court noted that all three of the parties' children would likely need "ongoing therapy" and that Sally would "likely receive very little child support from [Jerry]" given his "limited income." These findings alone, however, are not sufficient to justify the unequal award based on the needs of the children or to allow meaningful review by us.[81] The parties' custody agreement required Jerry to pay child

---

[78] (...continued)
reevaluate the merits of the property division.") (citing *Nicholson v. Wolfe*, 974 P.2d 417, 422 (Alaska 1999)).

[79] *See Arndt v. Arndt*, 777 P.2d 668, 670 (Alaska 1989).

[80] *Engstrom v. Engstrom*, 350 P.3d 766, 774 (Alaska 2015) (quoting *Rodvik v. Rodvik*, 151 P.3d 338, 347 (Alaska 2006)).

[81] *See Pfeil v. Lock*, 311 P.3d 649, 653 (Alaska 2013) ("Factual findings supporting marital property distribution 'must be sufficient to indicate a factual basis for
(continued...)

support as well as any future counseling expenses for the children; the superior court's reference to Jerry's "limited income" does not, without more, show that this was insufficient to meet the needs of the children. Although it was not necessarily improper for the superior court to rely on this factor in dividing the marital estate, we conclude that this case should be remanded to the superior court to reconsider and explain this aspect of the property division.

## E. Due Process

Jerry also claims the superior court made "numerous errors which violated [his] due process rights." We have already rejected two of these claims — that the court was biased against him, and that he had the "right to have a decision based only on evidence properly admitted" — so they are not included in the following analysis. We also have already determined that the superior court erred by considering Jerry's criminal act in the property division, so we do not reach Jerry's claim that this also violated his due process rights.

### 1. Notice of proposed action and grounds asserted and opportunity to respond.

#### a. Property stipulation

Jerry claims that the court "disregarded" the parties' property value stipulation. He argues that the document placed the burden on Sally to prove that her post-separation expenditures were for living expenses, while the superior court's legal analysis placed the burden on him to show that Sally had wasted or misused marital funds. But for the reasons discussed above, Jerry misreads the parties' stipulation, which

---

[81] (...continued) the conclusion reached.' " (quoting *Cartee*, 239 P.3d at 713)); *Doyle v. Doyle*, 815 P.2d 366, 368 (Alaska 1991) ("[T]he trial court must render findings of ultimate fact that support any decreed property division; the findings must be explicit and sufficiently detailed to give [us] a clear understanding of the basis of the trial court's decision.").

explicitly reserved for trial the treatment of Sally's expenditures and did not require her to prove that they were a form of interim spousal or child support.

Relatedly, Jerry argues that he "would not have proceeded to trial without receiving [Sally's] financial records if he had known that the [superior] court would place on him the burden of proving that the retirement assets were [unreasonably] dissipated." He also claims he "would have filed an interlocutory appeal if the court had properly informed him that [Sally's] pre-trial award of the marital assets could or would be treated as interim support."[82]

But superior courts have no obligation to advise pro se litigants on substantive law.[83] And at the September 2011 hearing, Sally's attorney indicated that Sally would be arguing that her expenditures were legitimate living expenses, and the court stated that it would reserve ruling on the issue until trial. Jerry therefore was on notice for more than two years about the approach the court eventually would adopt at trial — the "typical[]" approach under our precedent.[84]

---

[82]    Because Sally's expenditures using marital funds were never "treated as interim support," we take this claim to mean he should have been informed that the court might exclude these assets from the property distribution under *Day v. Williams*, 285 P.3d 256 (Alaska 2012).

[83]    *See McLaren v. McLaren*, 268 P.3d 323, 334 (Alaska 2012).

[84]    *See Day*, 285 P.3d at 264 ("Marital assets that are spent after separation for marital purposes or normal living expenses are not typically taken into account in the final property division." (quoting *Partridge v. Partridge*, 239 P.3d 680, 692 (Alaska 2010))).

### b.    Property division

Similarly, Jerry argues that he did not have adequate "notice that moral fault could be considered as a factor in [the] property division."[85] He notes that Sally's trial position was that Jerry's earning capacity remained high despite his conviction, not that Jerry's poor finances should be discounted in the property division. Jerry further notes that the superior court correctly stated at trial that moral or legal "fault . . . isn't a factor" in the property division. And he claims that the court obtained affirmation from both parties that the issue of his sexual offense was "irrelevant" to the property division decision.

But Jerry *was* on notice that the superior court might consider his criminal conviction with regard to the parties' financial circumstances. In its September 2013 order granting Sally's request to sell the marital residence, the court cited Jerry's criminal conviction while rejecting his analysis of the AS 25.24.160(a)(4) factors: "If, as he claims in his pleadings, his earnings capacity is low because of his criminal conviction, he will be unable to pay significant child support. The children's financial needs would then have to be considered when the court looks to the 'circumstances and necessities of each party.' " Moreover, our case law clearly establishes that the superior court has significant discretion "to ascribe different weights to [the AS 25.24.160(a)(4)] factors upon hearing the evidence at trial";[86] this includes the discretion to give little or no weight to a party's financial circumstances if equity so demands.

---

[85] We interpret this claim to mean Jerry lacked notice that the court might conclude that his sex offense conviction was the cause of his poor economic circumstances and that he should not "benefit" from his conviction in the property division.

[86] *Cartee*, 239 P.3d at 715 (first citing *Veselky v. Veselky*, 113 P.3d 629, 637 (Alaska 2005); then citing *Cox v. Cox*, 882 P.2d 909, 913 (Alaska 1994)).

Jerry's claim that the parties agreed his sex offense was irrelevant to the property division is also without merit.  In the portion of the trial transcript Jerry cites, the parties did agree that there was no need to go into the reasons why Daniel and Lara were misbehaving and "creating . . . chaos in the home" in the two years immediately preceding the divorce.  But there was no blanket agreement that Jerry's "sexual misconduct was irrelevant to the property division," as Jerry claims.

### 2.    Right of confrontation

Jerry argues that the superior court's "reliance upon testimony reviewed in the criminal case but not admitted in the divorce case" violated his right to confront and cross-examine witnesses.  But Jerry points to no instance where the superior court "reli[ed] on testimony reviewed in the criminal case."  Moreover the Confrontation Clause applies only to criminal proceedings.[87]  Although Jerry is correct that the U.S. Supreme Court has adopted its guarantees in civil cases "where administrative and regulatory actions [are] under scrutiny,"[88] this is not such a case.  And while the ability to cross-examine witnesses at trial is certainly a component of due process, Jerry cross-examined all of Sally's witnesses.

### 3.    Right to counsel

Jerry argues that the superior court denied his constitutional right to counsel by awarding Sally a "de facto" attorney's fee award while he was forced to represent himself pro se for lack of funds.  However, the right to state-funded counsel is typically (but not exclusively) limited to criminal proceedings, and the case Jerry cites to support

---

[87]    *See* U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."); Alaska Const. art. I, § 11 ("In all criminal prosecutions, . . . [t]he accused is entitled . . . to be confronted with the witnesses against him.").

[88]    *Greene v. McElroy*, 360 U.S. 474, 496-97 (1959).

his alleged right to counsel, *Flores v. Flores*, holds only that a right to counsel exists in contested child custody proceedings "where an indigent party's opponent is represented by counsel provided by a public agency."[89] Because Jerry does not contest the court's child custody determination, *Flores* is inapplicable.

As discussed above, however, there is an inconsistency between the superior court's finding that Sally did not waste or misuse marital funds (including the $30,000 she spent on attorney's fees) and the court's denial of Sally's request for attorney's fees. But this inconsistency appears to be a factual error on the part of the court, not an infringement on Jerry's alleged right to counsel.

### 4. Adequacy of record and court's reasoning

Finally, Jerry claims the superior court "repeatedly failed to make findings sufficient for appellate review." First, Jerry argues that the court was required to make explicit findings for denying his attorney's fees request,[90] and he notes that the court never addressed the request he made for attorney's fees in his closing argument and later rejected his motion for interim attorney's fees as moot in light of the judgment. Second, Jerry claims that he was ordered to pay a total of $9,432.54 post-separation for credit card debt and a mortgage payment, which the court did not mention in its order, and he argues that the court was required to "make factual findings on whether a credit is appropriate."[91] And third, Jerry claims that the court considered his child support obligation and Sally's child-care responsibilities without finding that the children's needs

---

[89]     598 P.2d 893, 896 n.12 (Alaska 1979).

[90]     *Cf. Houston v. Wolpert*, 332 P.3d 1279, 1285-86 (Alaska 2014) (requiring such findings with regard to attorney's fees requests pertaining to actions to modify, vacate, or enforce child custody or visitation orders).

[91]     *See Berry v. Berry*, 978 P.2d 93, 96 (Alaska 1999).

were not being met. We already found that the superior court did not make sufficient findings to justify basing the property division on the needs of the children; because we are remanding the case for further findings on the matter, we do not address whether the lack of findings also violated Jerry's due process rights.

Jerry fails to argue on appeal why his request for attorney's fees should have been granted, so the claim arguably is waived. However this case must be remanded for further proceedings regarding Sally's pretrial attorney's fees expenditures and other aspects of the property division. We therefore also direct the superior court to rule on Jerry's request at trial for attorney's fees.[92]

Jerry's claim regarding post-separation expenses is without merit. Jerry used "[t]he unpaid balance on [his] income" — that is, *marital funds* — to pay off the credit card debt Sally incurred in the months after the parties' separation. The court's finding that Sally had not wasted or misused marital assets encompasses these expenses. Therefore Jerry's credit card payments fell within the court's *Day* analysis, rendering recapture inappropriate and requiring no further explanation by the court. And it is unclear why Jerry thinks he deserves a mortgage payment credit, since the documents he cites show he already was reimbursed for this payment, which means he effectively never paid it. Jerry points to no evidence demonstrating that he made other mortgage payments.

---

[92] For example in *Edelman v. Edelman*, we directed the trial court to consider the issue of attorney's fees on remand even though the appellant in the divorce proceeding had "fail[ed] to specify in her briefing both the basis for any award and the amount she s[ought]," because we already were remanding the case for findings on the valuation and distribution of property and because the trial court "denied without explanation" the appellant's motion for attorney's fees. 3 P.3d 348, 359 (Alaska 2000) (noting that the lack of specificity in the appellant's briefing would "normally be fatal to her argument").

For these reasons, Jerry's underlying claim that he suffered a due process violation because the court's findings and reasoning were inadequate is without merit.

## V.   CONCLUSION

The superior court's decision on the attorney's fees and property division issues is REMANDED for reconsideration consistent with this decision. The balance of the judgment is AFFIRMED.